In re **SPECIAL SEPTEMBER 1978 GRAND JURY (II).**

Appeal of **UNITED STATES of America.**

No. 79–1218.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1979.

Decided Dec. 19, 1980.*

---

* In response to the petition for rehearing, the original opinion issued April 30, 1980, has been modified. On December 19, 1980, the rehearing petition was denied.

Larry C. Willey, U. S. Dept. of Justice, Washington, D.C., for appellant.

Jerold S. Solovy, Jenner & Block, Wilber H. Boies, Chicago, Ill., for appellee.

Before FAIRCHILD, Chief Judge, SWY-GERT, Circuit Judge, and GRANT, Senior District Judge.**

SWYGERT, Circuit Judge.

This appeal involves two grand jury subpoenas duces tecum, one served on the Chicago law firm of Jenner & Block and the other on the Chicago law firm of McDermott, Will & Emery, for production of files and documents relating to the firms' representation of the Community Currency Exchange Association of Illinois ("the Association") which is the subject of a federal grand jury investigation. At issue is whether the district court erred when it quashed the Jenner & Block subpoena because of the attorney-client privilege and the work product doctrine, and when it quashed the McDermott, Will & Emery subpoena on the basis of the work product

---

** The Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, is sitting by designation.

doctrine. A preliminary issue raised by appellees Jenner & Block and the Association is whether the Government's *in camera* submission of Grand Jury material to show prima facie fraud was violative of due process.

We hold that the district court correctly concluded, in the circumstances of this case, that *in camera* submission was appropriate. After examining the documents submitted *in camera* by the Government to support its assertion that ongoing fraud by the Association dissipated the attorney-client privilege, we have concluded that a prima facie showing of fraud was made and that the trial judge abused his discretion in upholding the attorney-client privilege with respect to the Jenner & Block subpoena.[1] Further we hold that the work product doctrine also may not be asserted by the Association because of its ongoing fraud.[2] The work product doctrine may be invoked by the Jenner & Block law firm but only to prevent the disclosure of the attorneys' mental impressions, conclusions, opinions, and legal theories about the case. If the Government is able to show extraordinary need, however, the work product doctrine may not bar disclosure. Because the issue of need was not addressed by the trial judge, we remand for that determination.

The trial judge found that there was ongoing client fraud by the Association in connection with the McDermott subpoena and therefore held that the attorney-client privilege was waived.[3] That ruling was not appealed. The McDermott subpoena was quashed because the trial judge held that the work product doctrine prevented enforcement. Because we have concluded that the subpoenaed documents were not prepared in anticipation of litigation, we reverse.

I

The Association is a not-for-profit corporation which serves as a trade association for the Illinois currency exchange industry.[4] Its membership includes approximately 550 currency exchange locations and approximately 350 owners. In November 1976, the Special November 1975 Grand Jury served

---

1. It is undisputed that the Jenner & Block law firm did not participate in the fraud.

2. The prima facie ongoing fraud by the Association consisted of deliberately filing false reports with the Illinois State Board of Elections, *see* pp. 60–61 *infra*. Although those false reports were filed by "an ad hoc group" and not in the name of the Association, we have determined that they were in fact Association reports. *See* p. 60 *infra*. The Jenner & Block subpoena sought information concerning those reports. In the subpoena, the term "ad hoc group" was defined as follows:

 any assemblage of individuals which (1) includes individuals who are or have been owners of currency exchanges within Illinois and (2) makes or made payments to or on behalf of appointed or elected Illinois public officials. "Ad Hoc Group" specifically includes the following individuals:
 1. Allen Ander 2. Irving Barr 3. Kenneth Bobrow 4. Ira Browne 5. George Christopher 6. Allen Eager 7. Jerome Gagerman 8. Seymour Gagerman 9. Robert Goldberg 10. Howard Goodman 11. Sol Gorr 12. Irving L. Gottlieb 13. Martin Holtzman 14. Sam J. Kaplan 15. Harry Klein 16. Lloyd Klowden 17. Irwin Leven 18. Michael Levitt 19. George W. Mattick 20. William McNichols 21. Emmett McMorrow 22. Joseph Miller 23. Arthur B. Nierman 24. Nerino Petro 25. Lewis Richtiger 26. Seymour Rosenberg 27. Michael Ryan 28. Donald Schellenberger 29. Frank Schellenberger 30. Daniel Schissler 31. J. Howard Segal 32. Louis Spilberg 33. Jack Swirsky 34. Frank Tufano 35. Mayer Weinstein.

 The above named individuals, all directors of the Association at some time during the period covered by the reports, were listed in the reports as comprising the "ad hoc group." Because we have determined that the "ad hoc group" was in fact the Association for purposes of the Board of Election reports, the "ad hoc group" is in the same position as the Association with respect to the Jenner & Block subpoena. Therefore, we intend that our holdings as to the Association apply as well to the "ad hoc group" insofar as we are discussing the Jenner & Block subpoena.

3. It is undisputed that the McDermott law firm did not participate in the fraud.

4. Currency exchanges are financial institutions which cash checks, issue money orders, sell license plates, and distribute food stamps. They are licensed by the State.

Jack Swirsky, secretary and custodian of records of the Association, with a subpoena calling for a list of all contributions made by the Association or its members to any individual holding an official position in Illinois.[5] Before that time the Grand Jury had been investigating the handling of food stamps by Illinois currency exchanges. After the expiration of the 1975 Grand Jury, the currency exchange investigation was transferred to the Special September 1978 Grand Jury and in April 1979, the 1978 Grand Jury returned a thirteen-count indictment, based on allegedly improper political contributions against seventeen currency exchange owners and the Association.

About one month after Swirsky was served with the subpoena requesting information about Association campaign contributions, an article appeared in the *Chicago Sun-Times* stating that Irving Gottlieb, a currency exchange owner and Association member, had made certain contributions to Illinois politicians for which he was reimbursed by other Association members. The article, dated December 9, 1976, began: "A powerful currency exchange trade group funneled thousands of dollars in illegal contributions to Illinois politicians through its former general counsel, a Sun-Times investigation shows." After learning of the *Sun-Times* article, Richard Anderson, Chief of Public Disclosure of the Illinois State Board of Elections, sent Gottlieb a letter directing his attention to the reporting requirements of a 1974 Illinois law requiring

disclosure of campaign contributions, Ill. Rev.Stat. ch. 46, § 9. Gottlieb referred Anderson's letter to Jenner & Block which thereafter prepared, and on January 31, 1977, filed a report with the Illinois State Board of Elections.[6] The report was filed in the name of "an ad hoc group" and not in the name of the Association. An amended report also was filed by the ad hoc group on April 15, 1977.

The trial judge found that the reported workings of the ad hoc group were in fact the "modus operandi of the Association. The reports described monthly contributions of $75 by group members into a fund used to reimburse the members for their individual state and local political contributions. Not disclosed in the reports was a second cash fund also used to reimburse members for political contributions. This second fund ("$300 fund") was composed of $300 collected from each currency exchange at the beginning of each state legislative session.

Two identical subpoenas duces tecum issued to Jenner & Block, one, from the Special November 1975 Grand Jury in February 1978 and the second, from the Special September 1978 Grand Jury in October 1978. The subpoenas directed a representative of the law firm to appear and produce files and documents concerning Jenner & Block's representation of its clients in connection with the reports filed with the Illinois State Board of Elections.[7] After receiving the

---

**5.** That subpoena is not at issue here.

**6.** In November 1976 the Jenner & Block law firm began representing the Association and some of its members in the matter of the grand jury investigation of political contributions by the currency exchange industry. The firm was previously representing the Association in the grand jury's food stamp investigation and had represented the Association over a period of about twenty years in a variety of matters.

**7.** The Jenner & Block subpoena called for:
Any and all documents which relate to the preparation and filing of (1) Statement of Organization and Reports of Campaign Expenditures filed January 31, 1977, with the State Board of Elections and the County Clerk of Cook County pursuant to the Illinois Campaign Financing Act, and (2) Amended Reports filed

April 15, 1977, both sets of reports by an Ad Hoc Group, as hereinafter defined and identified, having no formal name or mailing address and each set of reports signed by Ira Browne, 1938 West North Avenue, Chicago, Illinois; such documents including but not limited to the following documents:
A. Any and all correspondence received by Jenner & Block furnishing information for preparation of the report(s).
B. Any and all memoranda of conversations and interviews of individuals with regard to information necessary for determination of the content of the report(s).
C. Any and all correspondence issued by Jenner & Block soliciting information for preparation of the report(s) including, but not limited to letters mailed to the individuals

first subpoena, Jenner & Block moved to quash, asserting that the materials requested were protected by the attorney-client privilege and the work product doctrine, and that the subpoena was overbroad, oppressive, and premature. The Government moved to enforce the subpoena, and submitted affidavits stating that the materials would give information as to the states of minds of individual currency exchange owners and the Association and that there was no alternative source of the information because potential witnesses were asserting their Fifth Amendment privileges and would not testify. The Government also submitted a number of *in camera* exhibits to the district court in support of its assertion that the Association had purposely filed false reports and hence could not avail itself of the attorney-client privilege because of the ongoing fraud exception. Some Association members sought and were granted leave to intervene. The intervenors and Jenner & Block moved for discovery of the documents submitted *in camera* by the Government.

When the 1975 Grand Jury expired, the trial court had not ruled on the motions to quash the Jenner & Block subpoena nor on the motions for discovery of the *in camera* material. The Grand Jury then issued an identical subpoena duces tecum. The first subpoena was quashed as moot by the trial court, and the previously-filed pleadings and papers were permitted to stand in relation to Jenner & Block's motion to quash the second subpoena. In January 1979, the court quashed the second subpoena on the basis of the attorney-client privilege and the work product doctrine. The judge

found that the Government had failed to make a prima facie showing of ongoing client fraud in the filing of the Board of Elections reports, and that the attorney-client privilege barred disclosure. He also held that the work product doctrine prevented enforcement of the subpoena. In addition, appellees' request to review the Government's *in camera* submissions was denied. The Government submitted additional *in camera* exhibits at an *ex parte* meeting with the district judge, which the Government stated were intended not to change the district court's ruling but which were necessary in order to complete the record. Government counsel and the judge had two other *ex parte* meetings concerning the supplemental *in camera* exhibits. The trial judge subsequently filed a slightly revised memorandum opinion and order that preserved his earlier ruling.

The law firm of McDermott, Will & Emery was originally retained by the Association in 1970 after the Association lost its tax exempt status. The McDermott law firm represented the Association before the Internal Revenue Service from mid-1970 to mid-1974, during which time it negotiated the payment of federal tax deficiencies and regained the tax exempt status of the Association. McDermott, Will & Emery continues to represent the Association in tax matters.

Identical subpoenas duces tecum issued from the 1975 Grand Jury in July 1978 and then in October 1978 from the 1978 Grand Jury to the McDermott law firm seeking documents pertaining to the tax status of the Association.[8] The law firm produced

---

listed in the report or any other persons, including other owners of currency exchanges.
D. Any and all time records of employees and billing statements pertaining to the preparation of the report(s).
E. Jenner & Block file Q1005900.
F. Jenner & Block file Q1005901.
G. Jenner & Block file Q1005904.
H. Jenner & Block file Q1005905.
I. Any and all memoranda regarding campaign contributions and reports required to be filed with any government body (state,

federal, county, etc.) relating to the above captioned files.

8. The McDermott subpoena called for:
1. Any and all documents and/or copies thereof which were sent to and/or received from the IRS with regard to and/or involving the Chicago Currency Exchange Association, Inc., and/or its successor in interest the Community Currency Exchange Association of Illinois, Inc. (hereafter "CCEA").
2. Any and all billing statements or statements of work performed for the CCEA.
3. Any and all notes, memoranda, correspondence involving the CCEA and/or any of its

some documents but refused to produce others, asserting the attorney-client privilege and the work product doctrine. The Government filed a motion to compel production of the withheld documents. Various individuals and the Association were granted leave to intervene, and memoranda were filed by the Government, the law firm and the Association. Included were in camera documents from both the law firm and the Government. The trial judge found that the Association had used the McDermott firm to file fraudulent tax returns during the period for which documents were subpoenaed. On that basis he held that the attorney-client privilege was waived as to the McDermott subpoena; however, he held that the work product doctrine prevented enforcement because of the absence of attorney complicity in the fraud.

The Government filed an appeal from the order quashing the subpoenaes. We granted the Government's motion to maintain the *ex parte* status of its *in camera* exhibits "without prejudice to the rights of the parties to argue in their briefs" for access. Subsequently, the appellees moved to dismiss the appeal and Jenner & Block and the Association moved, in the alternative, for discovery of the *in camera* materials. Those motions were denied with a note that the panel could, if it chose, decide to allow access. The issue of access to the *in camera* exhibits was again raised in two footnotes to the joint brief of appellees Jenner & Block and the Association.

## II

■ At the outset we must resolve the jurisdictional challenge raised by Jenner & Block and the Association. Title 18, United States Code, section 3731 provides:

An appeal by the United States shall lie to a court of appeals from a decision or order of a district courts [sic] suppress-

ing or excluding evidence . . . if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

Three circuits have interpreted this section to permit a Government appeal during a grand jury investigation from an order denying disclosure. *In re Grand Jury Investigation*, 599 F.2d 1224, 1226 (3d Cir. 1979); *Nixon v. Sirica*, 487 F.2d 700, 721 n. 100 (D.C.Cir. 1973); *United States v. Calandra*, 455 F.2d 750, 751–52 (6th Cir. 1972). This court has previously permitted the Government to appeal the denial of a Government motion to disqualify an attorney during a grand jury investigation. *In re Special February 1977 Grand Jury*, 581 F.2d 1262 (7th Cir. 1978). We now hold that section 3731, 18 U.S.C. § 3731, permits the Government to appeal from the quashing of a grand jury subpoena.

■ Jenner & Block and the Association argue that we should not entertain this appeal because section 3731 requires the Government to certify that the subject matter of the appeal constitutes a "substantial proof of a fact material in the proceeding" and here the Government certified only that "the documents sought are material to the pending grand jury investigation." A similar challenge was presented to us in *United States v. Comiskey*, 460 F.2d 1293 (7th Cir. 1972), where the Government's certification did not track the statutory language, but instead stated that the suppressed materials constituted "substantial proof of the charge alleged." We held that the certification sufficiently complied with section 3731, stating: "The form of the certification is not prescribed in the statute." *United States v. Comiskey, supra* at 1298.[9] We note further that the Eighth and Tenth Circuits have held that the fail-

members with regard to the tax status of CCEA.
4. Any and all CCEA documents or copies thereof.

9. In *United States v. Comiskey, supra,* the statutory language concerning certification was identical to that at issue here even though we are construing section 3731 as amended in 1971, while *Comiskey* was decided under section 3731 as amended in 1968.

ure to file any certification does not deprive the courts of jurisdiction over the appeal. *United States v. Kleve*, 465 F.2d 187 (8th Cir. 1972); *United States v. Welsch*, 446 F.2d 220 (10th Cir. 1971). In the instant case, we hold that the certification was adequate in meeting the statutory requirements.

### III

Appellees Jenner & Block and the Association assert that the district court's *in camera* examination of the Government's exhibits in order to decide whether there was prima facie fraud constituted a violation of due process. They argue that evidentiary presentations available only to one party have always been disfavored and that the Government's interest in grand jury secrecy is not viable in this case.

It is true that there are cases which have held that certain *in camera* submissions violated due process. In *In re Taylor*, 567 F.2d 1183 (2d Cir. 1977), the district judge decided on the basis of the Government's *in camera* submissions to disqualify a grand jury witness's attorney. The Government had alleged a conflict of interest based on the attorney's representation of several associates of the witness, whom the witness would be asked to incriminate after he himself was given immunity by the grand jury. The Second Circuit found that the need for maintaining the secrecy of the *in camera* documents was minimal, because the Government planned to disclose the information to the witness just as soon as his attorney was disqualified and he could be called to testify before the grand jury:

> [T]he [grand jury] secrecy interest, which the Government seeks to protect through the court's *in camera* proceeding, would obtain only as long as it will take the appellant to reach the door to the grand jury room through which he will leave.

567 F.2d at 1189. In light of the imminence of the disclosure of the secret material, the court held that it violated due process to deny the witness access to the information and prevent him from contesting the conflict of interest charges. Our case is differ-

ent from *In re Taylor* because here the Government does not intend to reveal the contents of the *in camera* grand jury material. Thus traditional considerations of the need for grand jury secrecy were dissipated in *Taylor* but do apply in this case.

 In *Mara v. United States*, 454 F.2d 580 (7th Cir. 1971), *rev'd*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), this court held that to justify the reasonableness of a grand jury request for handwriting and printing exemplars, the Government must show reasonableness by presenting its affidavit in open court rather than *in camera*. *Mara* was reversed by the Supreme Court on the basis that no reasonableness showing was required in order to obtain the exemplars, and hence our holding as to how reasonableness must be shown is no longer the law. At any rate, our decision in *Mara* was based on entirely different considerations than those presented here. The *in camera* submission in *Mara* was a Government affidavit which had been presented to the grand jury but which did not recount proceedings before the grand jury. Disclosure, we stated, was appropriate because "the information contained therein [was] the fruit of the government's own investigatory activity and [did] not bear the imprint of the grand jury's independent initiative." 454 F.2d at 584. We distinguished that situation in which the disputed materials were not generated by the grand jury by noting that the grand jurors would not be discouraged by that disclosure from engaging in "uninhibited investigation, full discussion and conscientious voting." 454 F.2d at 583. We also reasoned that the policies behind the need for grand jury secrecy did not apply because the affidavit contained no information elicited from witnesses or complainants before the grand jury and thus would not discourage current or future witness participation. In the case at bar, the evidence submitted to show the prima facie fraud consists not of a Government affidavit but of grand jury testimony and affidavits prepared by grand jury witnesses. The very reasons for grand jury secrecy

discussed but rejected as inapplicable in *Mara* are relevant here.[10]

In the circumstances of this case, we are persuaded that the court's *in camera* inspection of grand jury documents did not violate due process. The Grand Jury was seeking to enforce a subpoena in furtherance of its own investigation. The *in camera* submissions were themselves generated by the Grand Jury's investigation and were necessary to support its claim that the subpoenaed documents should be made available. Crucial to our decision is the fact that the finding of prima facie fraud based on the *in camera* submissions waives the attorney-client privilege and work product doctrine only as to this Grand Jury subpoena and not in regard to any other proceeding.[11] In *In re September 1975 Grand Jury Term*, 532 F.2d 734 (10th Cir. 1976), the argument was made, as here, that a determination of prima facie fraud in a grand jury proceeding must be made in an adversary hearing. The court held that an adversary hearing was not necessary where the documents were sought for the grand jury:

> This is not a case like *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973.... The question there arose during the trial on the merits.... *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 ... is not in point. In that case the government, after trial on the merits, had conceded certain electronic surveillance. The question was whether the records of such surveillance should be examined in camera by the court....
>
> The statements in those opinions relating to adversary proceedings were applicable to the situations there presented. They are not applicable to the grand jury proceedings with which we are concerned.

532 F.2d at 737. The Supreme Court has also recognized the difference between what is required at trial as opposed to in a grand jury proceeding: "Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *United States v. Dionisio*, 410 U.S. 1, 17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973). *See also Matter of Special February 1977 Grand Jury*, 570 F.2d 674 (7th Cir.), *cert. denied*, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978).

Although some indictments have been returned and disposed of, the Grand Jury's investigation is ongoing. The interest in maintaining secrecy is greatest when the

---

10. Other cases cited by appellees are also inapposite. *Briscoe v. Kusper*, 435 F.2d 1046, 1057 (7th Cir. 1970), did not involve a grand jury investigation or grand jury materials. In *State of Illinois v. Sarbaugh*, 552 F.2d 768 (7th Cir. 1977), inspection of grand jury materials was sought by the plaintiff in a civil action. The defendants had already obtained copies of those transcripts pursuant to a criminal action. In addition, the grand jury had long since been discharged. This court stated that it would permit disclosure on the limited basis that the witness's corporate employer, who had the greatest reason and power to retaliate, had already seen the transcript, and in addition, the witness was presently scheduled to give testimony at trial or by deposition.

Amicus curiae suggests that we adopt the disclosure standards set out in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) for determining disclosure in Freedom of Information Act cases. Under the Freedom of Information Act, there is an "overwhelming emphasis upon disclosure" and exemptions are construed very narrowly. 484 F.2d at 823. In contrast, our case concerns not a disclosure statute but the " 'indispensable secrecy of grand jury proceedings.' " *United States v. Procter & Gamble*, 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958), quoting *United States v. Johnson*, 319 U.S. 503, 513, 63 S.Ct. 1233, 1238, 87 L.Ed. 1546 (1943). We will not transfer standards that may be appropriate in Freedom of Information Act cases to the grand jury context. In addition, the court in *Vaughn* noted that there were many hundreds or thousands of pages of *in camera* materials and that it would be unreasonable to expect the court to be able to thoroughly examine that quantity without the required indexing and disclosures. In the case at bar, the amount of *in camera* material was far more limited and could be adequately examined by the court.

11. Our holding applies only to the propriety of not quashing the subpoena; a different question may well arise if Jenner & Block defends a contempt proceeding on the basis of the attorney-client privilege.

grand jury is still conducting its investigation, although that interest is not eliminated even after the grand jury has completed its work. *See Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979). From our examination of the disputed documents, we, like the trial judge, are persuaded that the secrecy of the *in camera* documents should be preserved. Those documents contain the words of grand jury witnesses, the disclosure of which could affect the continued cooperation of those witnesses and chill or distort the future testimony of others.[12] In these circumstances, the judge's decision to view the documents *in camera* did not constitute a due process violation or an abuse of his discretion. *In re September 1975 Grand Jury Term*, 532 F.2d 734 (10th Cir. 1976) ("We find no authority which holds that such determination must be made in an adversary hearing").[13]

We turn next to the *ex parte* communications that took place between Government counsel and the trial judge subsequent to the judge's announced decision. Despite the fact that those conferences were for the purpose of obtaining the court's permission to supplement the record with additional *in camera* material, which material would not have been available to the parties, there was no excuse for the failure to give notice to the other parties that the judge was being contacted by the Government and that additional materials were being offered.

■ Although we condemn the Government's failure to so notify the parties, an examination of the transcripts of the *ex parte* conferences convinces us that Jenner & Block and the Association were in fact not prejudiced by those meetings. Nor do we find that the Government was acting in bad faith. On repeated questioning by the trial judge, the Government lawyer credibly contended that the additional submissions, unavailable earlier, were offered only to supplement the record for purposes of appeal and not with the intention of changing the court's opinion. Because the trial court's announced decision was adverse to the Government, we can understand why Jenner & Block and the Association contend that the Government was trying to move for reconsideration. The transcripts, however, show otherwise:

> THE COURT: Is there any basis for thinking that it may change my opinion? [COUNSEL]: No. Unfortunately, your Honor, I think not.
>
> * * * * * *
>
> [COUNSEL] [after describing an additional *in camera* submission]: Based upon your Honor's factual determinations and rejection of the government's arguments before, I don't think there is any change that would be made here—
>
> * * * * * *
>
> [COUNSEL]: I do not believe it would make any difference, unless your Honor were to agree with the government's position that the failure to have included the $300 fund in the Ad Hoc Reports made those reports a false item, and therefore, a coverup activity.
>
> * * * * * *
>
> [COUNSEL]: The items that we are asking your Honor to permit us to supplement the record with now, I cannot perceive that it would change your Honor's

---

**12.** In *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 219, 99 S.Ct. 1667, 1673, 60 L.Ed.2d 156 (1979), the Supreme Court set out the interests served by safeguarding the secrecy of grand jury proceedings:

> First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

(footnote omitted.)

**13.** Neither did it constitute a denial of any Sixth Amendment rights. *See infra* at 26.

mind. I wish I could say so, but I cannot perceive that it would.

\* \* \* \* \* \*

[COUNSEL]: ... I know you asked me directly would it make any difference, and, as much as I would like to answer that affirmatively, as an officer of the court I must respond I don't believe so.

\* \* \* \* \* \*

THE COURT: Well, I didn't want it to appear that you were seeking to get a determination before the Court of Appeals on a different set of facts than was on this level.

[COUNSEL]: No, and frankly, your Honor, if the facts had been different than what had been argued to your Honor I would have felt ethically bound to come in with a motion for reconsideration rather than asking for a supplement. The reason why we simply followed the vehicle of asking leave to supplement is because it is the same factual arguments that we have presented to this Court.

The trial judge did examine the additional submissions submitted *ex parte*, but he did not change the substance of his earlier ruling. In addition, the judge himself decided that the record should not be supplemented in an *ex parte* meeting and withheld formally admitting the new materials until the parties had been served and a hearing could be held in open court. In the situation here, we hold that the *ex parte* communications did not constitute reversible error.

**A. The Jenner & Block Subpoena**

**1. The Attorney-Client Privilege**

■ It is settled that the attorney-client privilege is waived when the client uses the attorney-client relationship to engage in ongoing fraud rather than to defend against past misconduct. *Clark v. United States,* 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933);

*United States v. Aldridge,* 484 F.2d 655 (7th Cir. 1973), *cert. denied,* 415 U.S. 921, 94 S.Ct. 1423, 39 L.Ed.2d 477 (1974). The Government contends that the trial judge erred with respect to the Jenner & Block subpoena when he failed to find a prima facie showing of ongoing client fraud in the filing of the Board of Elections reports. Specifically, the Government argues that the Association (1) failed to identify the "ad hoc group" filing the reports as the Association; (2) omitted any mention of the "$300 fund" wherein $300 was collected from each currency exchange at the beginning of each state legislative session for the purpose of reimbursing members for political contributions; and (3) inaccurately reported an alleged $10,000 contribution or "bribe" to the "Friends of Dan Walker." [14]

■ The trial judge examined the documents submitted *in camera* by the Government and concluded that there was no ongoing fraud. Because the determination of whether the Government has made prima facie showing of ongoing client fraud lies in the sound discretion of the trial judge, we may not overturn his decision unless that discretion has been abused. *In re September 1975 Grand Jury Term,* 532 F.2d 734 (10th Cir. 1976).

The trial judge found that the ad hoc group reports filed with the Illinois State Board of Elections did in fact describe the workings of the Association. We are convinced from an independent examination of the record, including the Government's *in camera* submissions, that the Board of Elections reports filed by "an ad hoc group" were Association reports. The Government correctly asserts that neither the name of the Association nor any reference to the currency exchange industry appears in the reports. Despite these facts, the trial judge failed to find that filing as an ad hoc group constituted fraud. We affirm that finding for the following reasons.

14. Section 9–26, Ill.Rev.Stat. ch. 46, § 9–26, provides:

 Willful failure to file or willful filing of false or incomplete information required by this article shall constitute a Class B misdemeanor. . . .

Section 9–25 provides:
 No person shall make an anonymous contribution or a contribution in the name of another person . . . .

We have already referred to the background fact that the filing of the reports was instigated by an article in the *Chicago Sun-Times* which exposed political contributions made by Irving Gottlieb, an Association member, for which he was reimbursed by other Association members. The article began: "A powerful currency exchange trade group funneled thousands of dollars in illegal contributions to Illinois politicians through its former general counsel. . ." After learning of the contents of the article, Richard Anderson, Chief of Public Disclosure of the Illinois State Board of Elections, wrote to Gottlieb suggesting that he consider filing as a "political committee" under the new Illinois law requiring disclosures of campaign contributions, Ill.Rev. Stat. ch. 46, § 9–1 et seq. Because it was the newspaper article and Anderson's letter which triggered the decision to file the reports, we do not believe that when the report was filed one month later in the name of "an ad hoc group," the Association seriously hoped to hide the relationship of the political contributions to the currency exchange industry or to the Association. However, because the Association had filed fraudulent tax returns indicating that no political contributions were made by the Association, it had reason to prefer filing its Board of Elections reports under some other name.

■ In filing as an ad hoc group, the Association says that it relied on a November 1976 opinion by the Illinois Attorney General which discussed the manner in which the Chicago Park District Commissioners who expended district funds to campaign for the passage of bonding referenda should file their reports under the same Illinois act. The Attorney General's official opinion stated: "Since the action of the Commissioners in question was beyond their power, it would be more appropriate if they filed in their own names, as a private interest group rather than in the name of the park district." We recognize that the ad hoc format had great appeal to the Associa-

tion which had in fact attempted to conceal its political contributions. But it is also true that the Illinois law was uninterpreted by the courts and that the Attorney General's opinion was arguably relevant.[15] We therefore cannot say that the trial judge abused his discretion in failing to find prima facie fraud because the reports were not filed in the name of the Association.

■ The Government next argues that there was ongoing fraud by the Association because the reports failed to disclose the "$300 fund," wherein $300 was collected from currency exchange owners at the start of each state legislative session for the purpose of establishing a fund from which to reimburse members for political contributions. The trial judge acknowledged the failure of the reports to disclose the "$300 fund," but did not find prima facie fraud because he concluded that the materials presented *in camera* "did not show whether the failure of members of the Association to tell the firm about the $300 fund before the filing of the amended report was negligent or purposeful." From our examination of the *in camera* documents, we are persuaded that the Government has demonstrated, at least prima facie, that the directors of the Association knew about the "$300 fund," that they did not disclose it to Jenner & Block which represented the Association in preparing the reports, and that they knew that the disclosure had not been made in the reports. We do not agree that the record fails to show whether the omission was negligent or purposeful. There was no showing of negligence. Instead, we conclude that the only reasonable inference that can be drawn from the entire record is that the Association intentionally failed to report its secret "$300 fund" used to reimburse members for political contributions.

We recognize that before the attorney-client privilege is waived, there must be " 'something to give colour to the charge [of fraud]'; there must be *prima facie* evidence that it has some foundation in fact.' " *Clark v. United States*, 289 U.S. at 15, 53

---

**15.** The filing requirements of the Illinois statute, Ill.Rev.Stat. ch. 46, § 9–1 et seq., did not become effective until January 1, 1975, and had yet to be construed by any court.

S.Ct. at 469 (citation omitted). But where that evidence exists, as it does here, "the seal of secrecy is broken." *Id.* The attorney-client privilege has been waived with respect to the Jenner & Block subpoena because there has been a prima facie showing that the reports purposely omitted any mention of this second secret fund.[16]

### 2. The Work Product Doctrine

The Government also contends that the trial judge erred when he invoked the work product doctrine to quash the Jenner & Block subpoena. The work product doctrine had its genesis in a civil action. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), but it has since been held to apply to criminal cases where it is "even more vital" to ensure the proper functioning of the criminal justice system. *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1974). In *In re Grand Jury Proceedings*, 473 F.2d 840 (8th Cir. 1973), the work product doctrine was extended to grand jury proceedings.[17]

The Government argues that the work product doctrine is inapplicable to the Jenner & Block subpoena for two reasons. First, the work product doctrine applies only to documents prepared " 'in anticipation of litigation.' " *Nobles, supra* at 238, 95 S.Ct. at 2170, quoting *Hickman, supra* at 508. According to the Government, the subpoena at issue did not seek materials prepared in anticipation of litigation because the documents requested from Jenner & Block were prepared for the filing of required state campaign contribution reports. Second, the Government argues that the work product doctrine like the attorney-

client privilege is dissipated by a finding of ongoing client fraud.

We conclude that the materials subpoenaed from Jenner & Block were indeed prepared in anticipation of litigation, even though they were prepared as well for the filing of the Board of Elections reports. The following sequence of events explains our conclusion. On November 11, 1976, the grand jury issued a subpoena, which is not at issue in this case, requiring the Association to furnish

> "[a] list of all contributions and the names of recipients thereof made by or on behalf of the association or any officer, agent, employee or member of the association to any individual seeking or holding any official position in . . . the State of Illinois or any governmental subdivision of the State of Illinois or if such a list does not exist, all documents which would disclose such information."

That subpoena was brought to the attention of Jenner & Block which was representing the Association in the Grand Jury investigation. The *Sun-Times* article disclosing political contributions by Association members appeared on December 9, 1976, about a month after the subpoena was served on the Association, and two weeks later, Anderson wrote to Gottlieb about the reporting requirements of the Illinois statute. Jenner & Block began preparing the Board of Elections reports after the letter from Anderson was brought to its attention by Gottlieb. By reason of this sequence of events, it is clear that the law firm knew before it began to prepare the reports that

---

**16.** We are aware that there were errors in the reporting of the "Friends of Dan Walker" contributions, but we need not decide whether those errors constituted prima facie fraud. The attorney-client privilege is waived by our finding that the "$300 fund" was intentionally omitted from the reports.

That the Association used Jenner & Block to file fraudulent reports with the Illinois State Board of Elections does not dissipate the attorney-client privilege with respect to other aspects of the grand jury investigation. Our holding is that the attorney-client privilege is waived as to the subpoena at issue here because the subpoena calls exclusively for infor-

mation pertinent to the filing of the fraudulent reports.

**17.** Neither Rule 26 of the Federal Rules of Civil Procedure nor Rule 16 of the Federal Rules of Criminal Procedure applies to grand jury proceedings. A grand jury investigation may result in criminal indictments but it is also similar in some aspects to pretrial discovery. *United States v. Nobles*, 422 U.S. 225, 247 n.6, 95 S.Ct. 2160, 2174, 45 L.Ed.2d 141 (White, J., concurring). Our conclusions as to the scope of the work product doctrine in a grand jury proceeding do not apply to a criminal pretrial proceeding with a known defendant or to a trial.

the Grand Jury as well as the Illinois State Board of Elections wanted information concerning political contributions by the Association. Therefore, the law firm is correct in asserting that the material called for in the subpoena at issue here, though prepared for the filing of reports, was prepared also in anticipation of the criminal proceedings which could result from the Grand Jury's investigation.

We turn next to the Government's contention that the work product doctrine cannot be asserted by Jenner & Block because a finding of ongoing client fraud dissipated that doctrine as it does the attorney-client privilege. Several circuits have acknowledged this issue, *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215 (4th Cir. 1976); *In re Murphy*, 560 F.2d 326 (8th Cir. 1977), but only the Third Circuit has decided whether there is a client fraud exception to the work product doctrine. In *In re Grand Jury Proceedings*, 599 F.2d 1224 (3d Cir. 1979), the court took the view that generally there is a client fraud exception to the work product doctrine, although in some circumstances a lawyer who has no knowledge of his client's wrongdoing can assert the work product doctrine and prevail.

█ We begin our own analysis by noting that the work product doctrine is "distinct from and broader than the attorney-client privilege." *United States v. Nobles, supra*, 422 U.S. at 238 n. 11, 95 S.Ct. at 2170 (1974), citing *Hickman v. Taylor, supra*. Although only confidential communications between the attorney and client are protected by the attorney-client privilege, the work product doctrine may encompass any document prepared in anticipation of litigation by or for the attorney. Further, the attorney-client privilege belongs to the client alone while the work product doctrine may be asserted by either the client or the attorney. *In re Grand Jury Proceedings*, 604 F.2d 798 (3rd Cir. 1979).

█ These dissimilarities are explainable because of differing underlying policies. The purpose of the attorney-client privilege is to encourage clients to make full disclosure to their attorneys:

As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice.

*Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). The work product doctrine, on the other hand, functions not merely and (perhaps) not mainly to assist the client in obtaining complete legal advice but in addition to establish a protected area in which the lawyer can prepare his case free from adversarial scrutiny.

Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Hickman v. Taylor, supra*, 329 U.S. at 511, 67 S.Ct. at 393–394. Justice Jackson, concurring, emphasized the importance of the work product doctrine for the protection of the lawyer: " . . . [I]t too often is overlooked that the lawyer and the law office are indispensable parts of our administration of justice. . . . The welfare and tone of the legal profession is therefore of prime consequence to society, which would feel the consequences of [requiring the disclosures] secondarily but certainly." *Hickman, supra* at 514–515, 67 S.Ct. at 395 (cited in *Nobles, supra* 422 U.S. at 237, 95 S.Ct. at 2169).

In the face of ongoing client fraud, the policy underlying the attorney-client privilege does not apply because the benefit of obtaining complete legal advice is not deserved when the advice sought refers to ongoing or future rather than to prior wrongdoing. 8 Wigmore on Evidence

§ 2298 at 573 (McNaughton Rev.1961). The attorney-client privilege, which may be asserted exclusively by the client and exists solely for his benefit, is therefore waived where there is ongoing client fraud.

▇▇▇ Because the work product doctrine may be asserted by both the client and the attorney, we bifurcate our analysis. We address the Association's situation first. A client may generally invoke the work product doctrine because, like the attorney-client privilege, it protects his interests by preventing disclosures about his case. When the case being prepared involves the client's ongoing fraud, however, we see no reason to afford the client the benefit of this doctrine. It is only the "rightful interests" of the client that the work product doctrine was designed to protect. *Hickman v. Taylor, supra* 329 U.S. at 510, 67 S.Ct. at 393. We conclude that the client cannot assert the work product doctrine any more than he can assert the attorney-client privilege when there has been a showing of ongoing client fraud. Therefore, we hold that the Association cannot invoke the work product doctrine as to the subpoenaed documents because of its prima facie fraud in the filing of the reports.

Where it is the attorney who asserts the work product doctrine, the fact of prima facie client fraud is not our only consideration. As we have noted one of the purposes of the work product doctrine is to protect the work of the attorney from disclosure for the benefit of the attorney. Jenner & Block argues that even if its client was engaging in fraud, the law firm should be able to claim the doctrine on its own behalf. As we perceive the problem, the policy in favor of insulating the attorney's work product for the sake of the attorney must be weighed against the policy which favors disclosure where the client has used his attorney to engage in fraud. We reach different conclusions depending on the type of information subpoenaed.

With respect to all information furnished to the attorney, whether transmitted in written form or communicated orally and recorded verbatim or in summary form, we conclude that the scale tips in favor of disclosure.[18] We reach this result because we are persuaded that the strong policy disfavoring client fraud requires that the client relinquish the benefit he would gain from the work product doctrine, which benefit is just as real although it is his attorney, rather than he, who asserts the doctrine. We are persuaded, however, that the attorney's mental impressions, conclusions, opinions, and legal theories must still be protected in order to avoid an invasion of the attorney's necessary privacy in his work, an invasion not justified by the misfortune of representing a fraudulent client. We therefore hold that the work product doctrine is waived for client fraud even when asserted by the attorney except that it is assertable to protect the attorney's mental impressions, conclusions, opinions, and legal theories about the case.

▇▇▇ The work product doctrine must yield to a showing of sufficient need by the party seeking to enforce the subpoena. *Hickman, supra*. However, we take note of Professor Moore's comment: "It has been a very rare case, indeed, in which inquiry has been permitted into the internal operation of the lawyer's office." 4 J. Moore, Federal Practice ¶ 26.03[8] at 394 (2d ed. 1979). The district judge failed to address the issue of the Grand Jury's need, and therefore we must remand for a determination of whether the Grand Jury has shown such extraordinary need as to justify production.

3. Fifth and Sixth Amendment Claims

▇▇▇ The Association, as well as the Association members who have intervened in this appeal, argue that to enforce the Jenner & Block subpoena would violate the Fifth Amendment rights of Association members and the Sixth Amendment rights of the Association as well as its members. We do not agree.

---

**18.** Although we require the disclosure of an attorney's summary notes of oral statements, we of course do not intend to require the attorney to prepare such a summary for purposes of the subpoena.

In *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), the Supreme Court held that the Fifth Amendment privilege against self-incrimination is not implicated unless incriminating documents are compelled from the person claiming to be incriminated by the disclosure. Recognizing that clients could thereby be discouraged from handing over incriminating documents to their attorneys for the purpose of securing legal advice, the Court went on to hold that in a case where a client could have asserted his privilege against self-incrimination to prevent disclosure if the documents were in his possession, the client can assert the attorney-client privilege to protect those same documents in the hands of his attorney. Because in the instant case the documents have been subpoenaed from the law firm rather than from the individual persons, it is only the attorney-client privilege and not the privilege against self-incrimination that can be asserted. However, the attorney-client privilege has been dissipated here as to the Jenner & Block subpoena because of the prima facie showing of ongoing Association fraud. Therefore, the Fifth Amendment claim, asserted directly or indirectly, must fail.

The contention that the disclosures would violate Sixth Amendment rights to the effective assistance of counsel is also without merit. The same argument was made and rejected by the Supreme Court in *United States v. Nobles*, 422 U.S. at 240 n. 15, 95 S.Ct. at 2171 n. 15. In the case before us the Association and its members cannot claim that their rights to the effective assistance of counsel were infringed because that right does not attach until criminal proceedings with a known defendant have been instituted. The Sixth Amendment right to effective assistance of counsel does not apply to a grand jury investigation. *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), citing *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). It is not disputed that these documents were subpoenaed for the continuing Grand Jury investigation and not for the criminal proceedings resulting from the indictments already returned.

### B. The McDermott Subpoena

The trial judge found that there was prima facie ongoing fraud by the Association in its tax filing and accordingly held that the attorney-client privilege was waived with respect to the McDermott subpoena. That ruling is not before us. The trial judge also held that the work product doctrine did apply to prevent enforcement of the subpoena because "in the absence of scienter by the law firm, characterizing some relationship between the firm's work and the client's fraudulent purposes and plans, the law firm's objection to the production of its work product must be honored." In this respect the trial court was in error.

The Government contends that the work product doctrine does not void the subpoena. First it is argued that the subpoena did not seek material prepared in anticipation of litigation because the documents requested from the McDermott law firm were prepared for the filing of federal income tax returns. Second the Government says that the finding of ongoing fraud dissipated the work product doctrine.

After reviewing the record, including the *in camera* documents submitted by the law firm, we have concluded that the McDermott documents were not prepared in anticipation of litigation and are therefore not protected by the work product doctrine.[19]

---

19. In his general discussion of the work product doctrine, the trial judge recognized that the doctrine does not attach where there is only a "remote possibility" rather than a "substantial likelihood" of litigation. He failed, however, to address the issue of whether the McDermott subpoena was directed to documents which fit that description. Instead, the district judge in upholding the work product doctrine to quash the McDermott subpoena, stated simply that all the documents requested were "a part of the work product of the law firm in its performance of services for the Association." He acknowledged that "[t]he simple role played by this firm was that of utilizing information obtained by it from its client for filling out and

McDermott, Will & Emery was retained by the Association in 1970 to regain the tax exempt status of the Association and to deal with a tax deficiency assessment. Since that time, McDermott has represented the Association in federal tax filings and matters concerning its tax exempt status. The law firm argues that its work was done after the Government's tax claim had arisen and was necessarily geared toward litigation if the tax exempt status and the deficiency could not be resolved by negotiation.

██ We do not read the "in anticipation of litigation" requirement so broadly. Although litigation could ultimately have ensued in connection with the Association's tax filings, a remote prospect of future litigation is not sufficient to invoke the work product doctrine. *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977). At most, the materials were prepared with an eye toward a possible administrative proceeding before the Internal Revenue Service. In *Velsicol Chemical Corp. v. Parsons*, 561 F.2d 671 (7th Cir. 1977), this court refused to apply the work product doctrine where documents were prepared for actual rather than potential administrative proceedings when those documents were subpoenaed for a later criminal investigation. Here the tax matters handled by the McDermott firm were even more remote from actual litigation. We therefore hold that the work product doctrine does not attach to prevent disclosure.[20]

The suggestion made by the McDermott law firm that there is a constitutional barrier to disclosure must be rejected for the reasons given in our discussion of the Jenner & Block subpoena. *Supra* at 59.

The order of the district court is reversed and the district court is directed to enforce the McDermott subpoena. The district court is further directed to reconsider the enforcement of the Jenner & Block subpoena in light of the foregoing opinion.

filing tax returns regularly utilized by exempt associations."

**20.** In light of our holding that the doctrine does not apply to the McDermott documents be-

cause they were not prepared in anticipation of litigation, we need not discuss the Government's contention that the Association's fraud dissipated the work product doctrine.