# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 07-2064/07-2727

_____

| | | |
|---|---|---|
| In re: Lance V. Addison, | * | |
| | * | |
| Debtor | * | |
| | * | |
| -------------------- | * | |
| | * | |
| Lance V. Addison, | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | Bankruptcy Appellate Panel |
| v. | * | for the Eighth Circuit. |
| | * | |
| Randall L. Seaver, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: March 10, 2008
Filed: August 7, 2008

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Shortly before Lance Addison filed his bankruptcy petition, he converted a portion of his nonexempt assets into exempt assets. After the bankruptcy trustee ("Trustee") filed an objection to Addison's claimed exemptions, the bankruptcy court concluded that Addison converted the assets with the intent to hinder, delay, or defraud a creditor. As a result, the bankruptcy court reduced Addison's homestead

exemption by $11,500, and denied the exemption claimed in his Roth IRA. The bankruptcy court also ruled that two college tuition savings accounts Addison had established for his children were property of his bankruptcy estate and not exemptible. Addison appealed the bankruptcy court's decision, and the Bankruptcy Appellate Panel (BAP) affirmed.

Subsequently, the Trustee initiated an adversary proceeding objecting to Addison's discharge. The bankruptcy court denied Addison's discharge, ruling as a matter of collateral estoppel that Addison had acted with the intent to hinder, delay or defraud one or more creditors when he converted his nonexempt assets to exempt assets within one year prior to filing bankruptcy. Addison also appealed this decision to the BAP and immediately requested that the BAP transfer the appeal to this court. The BAP did so, and we now hear Addison's consolidated appeals. We affirm in part, reverse in part, and remand for further proceedings.

I. *Background*

Addison, a part-owner of a cable company, had personally guaranteed some of his company's debt. In early 2005 the business was unable to pay its debts, and JP Morgan Chase ("Chase"), a company creditor, began to pursue Addison on a $1.3 million personal guarantee. Around June 2005, Addison first sought the advice of bankruptcy counsel in an effort to protect himself from Chase's attempts to enforce the guarantee. On or about July 21, 2005, Addison used $4,000 of his nonexempt funds to establish a Roth IRA for himself and used another $4,000 of the nonexempt funds to establish a Roth IRA for his wife. The funds came from a brokerage account that contained $45,476.71 in nonexempt funds prior to these transfers.

On October 14, 2005, Addison instructed his wife to use $11,500 in nonexempt funds to make a voluntary principal payment on their home mortgage. Addison's wife transferred $9,000 of this payment from the brokerage account mentioned above, and $2,500 came from a bank account at U.S. Bank. Later that same day, Addison filed

an individual Chapter 7 bankruptcy petition. He chose the Minnesota state exemptions and claimed his Roth IRA[1] and the equity in the house as exempt.

In May 2004, Addison had established a college tuition savings account, pursuant to 26 U.S.C. § 529 ("Section 529 accounts"), for each of his two children. Section 529 account balances fluctuate with the equity markets, but on the date of his bankruptcy filing, the accounts were worth approximately $22,000 combined. Addison listed the Section 529 accounts on his bankruptcy schedules but claimed that the accounts were owned by his children and thus were not property of his bankruptcy estate. To the extent that the Section 529 accounts were property of the estate, however, Addison claimed them as exempt.

The Trustee objected to Addison's homestead and Roth IRA exemptions, and asserted that the Section 529 accounts were property of the estate not subject to any exemption. The bankruptcy court held an evidentiary hearing on the Trustee's objection and subsequently ruled in favor of the Trustee on all three issues. The court found that Addison made the $11,500 house payment and the $4,000 Roth IRA payment with the intent to hinder, delay, or defraud his creditors, and thus denied, in full, Addison's claimed exemption in the Roth IRA and ordered that the homestead exemption be reduced by $11,500. The bankruptcy court also ruled that the Section 529 plans were property of Addison's bankruptcy estate and that they were not subject to any applicable exemption.

The BAP affirmed, ruling that the bankruptcy court's finding that Addison had the intent to hinder, delay, or defraud his creditors when he converted the nonexempt assets into exempt assets was not clearly erroneous. The BAP also affirmed the bankruptcy court's determination that the Section 529 accounts were property of the estate and not subject to exemption. Addison timely appealed to this court.

---

[1]The Roth IRA opened in Addison's wife's name is not at issue in this case.

After the bankruptcy court found that Addison intended to hinder, delay, or defraud a creditor when he converted his nonexempt assets into his homestead and Roth IRA, the Trustee initiated an adversary proceeding to deny Addison's discharge under 11 U.S.C. § 727(a)(2). Because a debtor's discharge can be denied under § 727(a)(2) if "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred . . . property of the debtor, within one year before" his bankruptcy filing, and the bankruptcy court had already concluded that Addison transferred nonexempt property to exempt property with the intent to hinder, delay, or defraud a creditor within a year before his bankruptcy filing, the court denied Addison's discharge under § 727(a)(2) on collateral estoppel grounds. Addison also appealed this ruling to the BAP, which certified the appeal directly to this court. We now consider both of Addison's appeals.

## II. *Discussion*

Addison argues that the bankruptcy court erroneously found that he converted nonexempt assets to exempt assets with the intent to hinder, delay, or defraud one or more creditors. More specifically, Addison contends that the bankruptcy court's disallowance of his Roth IRA exemption claim and its reduction of his homestead exemption should be reversed along with the denial of his discharge. Further, Addison asserts that the bankruptcy court erred in ruling that the Section 529 accounts that he established for his children are property of his bankruptcy estate and in ruling that they are not subject to any exemption. Like the BAP, we review the bankruptcy court's conclusions of law de novo and its findings of facts for clear error. *Official Comm. of Unsecured Creditors v. Farmland Indus., Inc. (In re Farmland Indus., Inc.)*, 397 F.3d 647, 650 (8th Cir. 2005).

### A. *Disallowance of Claimed Exemptions*

The bankruptcy court found that Addison acted with the intent to hinder, delay, or defraud one or more of his creditors. Shortly before filing for bankruptcy, Addison converted nonexempt funds from a brokerage account and a bank account to pay down

the mortgage on his home thereby increasing his homestead exemption. Also, he converted nonexempt funds from his brokerage account into an exemptible Roth IRA.

Under § 522(b) of the Bankruptcy Code, "a debtor can choose to exempt from property of the bankruptcy estate that property which is exempt under the applicable state or federal law." *Sholdan v. Dietz*, 108 F.3d 886, 888 (8th Cir. 1997) ("*Sholdan I*"); 11 U.S.C. § 522(b). Here, Addison elected to use the Minnesota state exemptions, and claimed a homestead exemption of $91,250 under Minn. Stat. Ann. § 510.02[2] and claimed his $4,000 Roth IRA as exempt under Minn. Stat. Ann. § 550.37(24).[3] These claimed exemptions were within the permissible amounts as provided by Minnesota law. *See In re Sholdan*, 217 F.3d 1006, 1008 (8th Cir. 2000) ("*Sholdan II*") ("The scope of a state-created exemption is determined by state law"). However, under Minnesota's enactment of the Uniform Fraudulent Transfers Act (UFTA), a debtor may not claim an exemption in property obtained through a transfer made by the debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor." Minn. Stat. Ann. § 513.44; *see also Sholdan II*, 217 F.3d at 1008 ("[U]nder section 513.44 of Minnesota's enactment of the Uniform Fraudulent Transfer Act (UFTA), a debtor may not claim a homestead exemption when he or she transfers the property 'with actual intent to hinder, delay, or defraud' creditors"); *In re Tveten*, 402 N.W.2d 551, 556 (Minn. 1987) ("[I]t clearly appears that under Minnesota law a debtor in contemplation of bankruptcy may convert nonexempt property into exempt property, so long as the conversion does not violate the Uniform Fraudulent Conveyance Act").

---

[2]At the time of Addison's bankruptcy filing, Minnesota law provided for a homestead exemption (in a non-agricultural homestead) up to $200,000 in value. Minn. Stat. § 510.02. Although it has no impact on this case, we note that the maximum homestead exemption (for non-agricultural homesteads) was increased to $300,000 when § 510.02 was rewritten in 2007.

[3]Minn. Stat. Ann. § 550.37(24) allows a debtor to exempt his "right to receive present or future payments, or payments received by the debtor, under a . . . Roth IRA . . . up to a present value of $30,000 . . . ."

Section 513.44(b) "contains a lengthy list of factors or 'badges of fraud' which a court may look to for help in determining actual intent." *Sholdan II*, 217 F.3d at 1008 (citing Minn. Stat. Ann. § 513.44(b)). Thus, Addison's claimed exemptions in his homestead and Roth IRA are not permitted if those assets were obtained by transfers made "with actual intent to hinder, delay, or defraud any creditor." Minn. Stat. Ann. § 513.44(a).

Additionally, when Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA),[4] it added, among other things, subsection (o) to § 522 of the Bankruptcy Code ("Code").[5] Under § 522(o) of the

---

[4]On April 20, 2005, President Bush signed BAPCPA into law. While the majority of BAPCPA's provisions did not take effect until October 17, 2005, § 1501(b) of the Act provided that certain amendments, including the provisions of 11 U.S.C. § 522(o), (p), and (q), "shall apply with respect to cases commenced under Title 11, United States Code, on or after the date of the enactment of this Act." Pub. L. 109-8 § 1501(b) (2005). Because Addison filed his bankruptcy petition on October 14, 2005—after BAPCPA was enacted—§ 522(o) applies to his case.

[5]Section 522(o), in pertinent part, states that:

[T]he value of an interest in--

(1) real or personal property that the debtor or a dependent of the debtor uses as a residence; [or]

. . .

(4) real or personal property that the debtor or a dependent of the debtor claims as a homestead

. . .

shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

Code, the amount of a state homestead exemption is reduced to the extent that the value of the exemption is attributable to nonexempt property that the debtor converted into the homestead within 10 years of filing for bankruptcy, if the conversion was made "with the intent to hinder, delay, or defraud a creditor." 11 U.S.C. § 522(o).[6] Thus, while the exemption Addison claimed in his Roth IRA is allowable unless it violates Minn. Stat. Ann. § 513.44(a), the claimed homestead exemption is subject to both 11 U.S.C. § 522(o) and Minn. Stat. Ann. § 513.44(a).

### 1. *Homestead Exemption*

The question here is whether the $91,250.00 that Addison claimed as his homestead exemption must be reduced by $11,500, under either Minnesota law or § 522(o) of the Code, due to the day-of-filing mortgage payment. For purposes of § 522(o), the issue turns on whether Addison acted "with the intent to hinder, delay, or defraud a creditor" when he transferred nonexempt funds to reduce the mortgage on his homestead. Congress did not provide any guidance regarding the construction of the phrase "with the intent to hinder, delay, or defraud" when it enacted § 522(o), but the statutory language is similar, if not identical, to the language used in § 548 and § 727 of the Code, as well as Minn. Stat. Ann. § 513.44(a).

---

11 U.S.C. § 522(o).

[6]Addison asserts that § 522(o) should not reduce the amount of a state homestead exemption because the scope of state exemptions have traditionally been determined by state law, *see Sholdan II*, 217 F.3d at 1008. We must reject this argument in light of the express language in § 522. *See* 11 U.S.C. § 522(b)(3) (providing that debtors who use a state's exemptions do so "*subject to subsection (o) and (p)*") (emphasis added). "The Congressional purpose is clear: debtors seeking the protection of state exemptions must meet their state exemption provision requirements *as limited by § 522(o)* and (p)." *In re Maronde*, 332 B.R. 593, 599 (Bankr. D. Minn. 2005) (emphasis added).

Section 548 of the Code provides that a trustee may avoid a pre-petition transfer of assets by the debtor if the debtor made the transfer "with actual intent to hinder, delay, or defraud" any past or future creditor. 11 U.S.C. § 548(a)(1)(A). Similarly, § 727(a)(2) bars a debtor's discharge if he takes certain actions, including transferring, concealing, or removing property of the estate within one year before filing, "with intent to hinder, delay, or defraud a creditor." 11 U.S.C. § 727(a)(2). Due to the similar wording of those statutes, numerous bankruptcy courts have looked to the body of case law construing §§ 548(a)(1) and 727(a)(2) to determine the meaning of "with intent to hinder, delay, or defraud a creditor" in § 522(o). *See Maronde*, 332 B.R. at 599 ("It is only logical to assume that Congress intended that by using essentially the same phrase in § 522(o), cases construing the fraudulent conveyance and discharge provisions also would apply to add body to the bare words of this new Congressional language"); *In re Fehmel*, No. 07-60831, 2008 WL 2151797, at *7 (Bankr. W.D. Tex. May 22, 2008) ("The phrase 'with the intent to hinder, delay or defraud a creditor' contained in § 522(o) is . . . not defined in the Bankruptcy Code . . . . Therefore, in interpreting the meaning of the phrase as contained in § 522(o), it is appropriate to look to case law interpreting [§ 727(a)(2) and § 548(a)(1)(A)]"); *In re Agnew*, 355 B.R. 276, 284 (Bankr. D. Kan. 2006) (construing the meaning of "intent to hinder, delay, or defraud a creditor" in § 522(o) from cases construing the meaning of intent to hinder, delay, or defraud in §§ 722(a)(2) and 548(a)(1)); *In re Lacounte*, 342 B.R. 809, 814 (Bankr. D. Mont. 2005) (same); *In re Sissom*, 366 B.R. 677, 691–92 (Bankr. S.D. Tex. 2007) (same).

Because direct evidence of fraudulent intent is rarely available, our cases have used the inferential "badges of fraud" approach to determine whether a debtor acted with "intent to hinder, delay, or defraud," a creditor regardless of whether the intent language came from a state fraudulent transfer statute or applicable bankruptcy law. *See Sholdan II*, 217 F.3d at 1009 (approving badges of fraud approach to determine whether debtor acted with "actual intent to hinder, delay, or defraud" under Minnesota fraudulent transfer statute in ruling on objection to homestead exemption); *Jackson*

*v. Star Sprinkler Corp. of Florida*, 575 F.2d 1223, 1237 (8th Cir. 1978) (using badges of fraud analysis to determine whether debtor made transfers with intent to hinder, delay, or defraud creditor under fraudulent transfer section of the then-applicable Bankruptcy Act); *see also Graven v. Fink (In re Graven)*, 936 F.2d 378, 383 (8th Cir. 1991) (comparing § 548(a)'s "actual intent to hinder, delay, or defraud" language with "intent to hinder, delay or defraud" in Missouri's then-applicable state fraudulent conveyance statute, noting that the two statutes use the "same standard"). Given the similarity of the language among these statutes, we conclude that the badges of fraud approach should also apply to determine a debtor's intent under § 522(o).[7]

Although both § 522(o) and Minn. Stat. Ann. § 513.44, like §§ 548(a)(1) and 727(a)(2), use the disjunctive "hinder, delay, or defraud," our circuit has been reluctant to deny a homestead exemption without a finding of intent to defraud. *See Sholdan I*, 108 F.3d at 888 (reversing bankruptcy court's finding that debtor converted nonexempt property into exempt homestead with intent to hinder or delay, and remanding for bankruptcy court to determine whether debtor acted with intent to defraud); *Panuska v. Johnson (In re Johnson)*, 880 F.2d 78, 80 n.1 (8th Cir. 1989) (noting that courts "generally view" the phrase "hinder, delay, or defraud" as "a single test" and refusing "to separate out the terms fraud, hinder and delay").[8] In *Sholdan I*, a 90-year old debtor, who had been sued for injuries caused by an automobile accident, sold substantially all of his nonexempt assets and used those proceeds to

---

[7]We reject the Trustee's position that § 522(o) provides a new standard for determining what type of evidence establishes a debtor's "intent to hinder, delay, or defraud" a creditor when the debtor converts nonexempt assets into his homestead. Rather, in our view, § 522(o) merely establishes a 10-year look-back period, from the date of the bankruptcy filing, from which such evidence may be considered.

[8]*See also Coder v. Arts*, 213 U.S. 223, 242 (1909) (explaining that "hinder, delay, or defraud" is a "form of expression . . . familiar to the law of fraudulent conveyances . . . and has always been held to require, in order to invalidate a conveyance, that there shall be actual fraud").

purchase a home with cash. *Id.* at 887. At all times while living in his new home, Sholdan had the assistance of a nurse. *Id.* For approximately a year prior to purchasing the house the debtor had been living in an assisted living facility, and on nights when a nurse was not available to stay with him in his newly purchased home, the debtor would return to the assisted living facility to spend the night. *Id.* Additionally, for the 13 years prior to residing at the assisted living facility, the debtor had not owned a home, but had lived in an apartment. *Id.*

Three months after purchasing the new home the debtor filed for bankruptcy and claimed his house as exempt. *Id.* The trustee objected to the homestead exemption, asserting that the debtor had purchased the home with the intent to hinder, delay or defraud a creditor. *Id.* The bankruptcy court sustained the trustee's objection and disallowed the claimed homestead exemption, finding that the debtor had acted with the intent to "hinder or delay" a creditor when he purchased the home. *Id.* The bankruptcy court did not rule on whether the debtor acted with intent to defraud a creditor. *Id.* at 887–88. The district court affirmed, holding that it was not necessary to find an intent to defraud. *Id.* at 888. We then reversed and remanded for the bankruptcy court to consider whether the debtor acted with the intent to defraud. *Id.* In reversing, we stated that "we do not mean to say that the test of 'hinder or delay' might not prevail under another set of facts," but ruled that the facts of that case "d[id] not support such a finding." *Id.*

In the instant case, the bankruptcy court found sufficient evidence to establish that Addison acted with the intent to hinder, delay, *and* defraud a creditor.[9] However,

_____

[9]In granting the Trustee's motion to reduce Addison's homestead exemption the court stated:

> I find and conclude that the transfers to the mortgage holder through any reduction of the mortgage debt were transfers of property made with the intent to hinder, delay, or defraud. It doesn't have to be fraud. Everyone

-10-

Addison took less aggressive actions than those present in *Sholdan*[10]—wherein we concluded that the facts did not support a finding of intent to hinder or delay. Applying our precedent, we conclude that the record here does not support the reduction of Addison's homestead exemption based on an intent to hinder or delay. *Id.*

Thus, we are left with the bankruptcy court's determination that Addison converted $11,500 in nonexempt funds into his homestead with the intent to defraud a creditor. "The question of whether an individual acted with intent to defraud in converting non-exempt property into exempt property is a question of fact, on which the bankruptcy court's finding will not be reversed unless clearly erroneous." *Sholdan II*, 217 F.3d at 1010 (citing *Hanson v. First Nat'l Bank*, 848 F.2d 866, 868 (8th Cir.1988)). "It is well settled that the mere conversion of non-exempt assets to exempt assets is not in itself fraudulent." *Id.*; *see also Hanson*, 848 F.2d at 868 ("It is well established that . . . a debtor's conversion of non-exempt property to exempt property on the eve of bankruptcy for the express purpose of placing that property beyond the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise would be entitled"); *Norwest Bank Nebraska, NA v. Tveten*, 848 F.2d 871, 873–74 (8th Cir. 1988) ("It is well established that under the Code the conversion of non-exempt to exempt property for the purpose of placing the property out of the reach of creditors, without more, will not deprive the debtor of the exemption to which

---

seems to focus on fraud, but hinder or delay is sufficient and I think *all of those are present here*.

Hearing Tr. at 61–62 (emphasis added).

[10]Both Sholdan and Addison took steps to protect their assets after being sued, but unlike Sholdan, Addison did not create an exempt asset by purchasing a home he did not previously have; rather, Addison made an additional lump-sum payment toward the mortgage on his existing home. Further, Addison did not convert substantially all of his nonexempt assets into the home as Sholdan had done.

he otherwise would be entitled"). Nevertheless, "[w]here the debtor acts with actual intent to defraud creditors, his exemptions will be denied." *Hanson*, 848 F.2d at 868.

"Before actual fraudulent intent can be found 'there must appear in evidence some facts or circumstances which are extrinsic to the mere facts of conversion of non-exempt assets into exempt and which are indicative of such fraudulent purpose.'" *Sholdan II*, 217 F.3d at 1010 (quoting *Tveten*, 848 F.2d at 875 (in turn quoting *Forsberg v. Security State Bank*, 15 F.2d 499, 502 (8th Cir. 1926))). In finding that Addison had the requisite intent to defraud, the bankruptcy court properly looked to the badges of fraud enumerated in Minn. Stat. Ann. § 513.44(b),[11] and found four

---

[11]Minn. Stat. Ann. § 513.44(b), provides a nonexclusive list of "badges of fraud" that may be considered, among other things, in determining a debtor's intent to defraud. These "badges" are whether:

(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Minn. Stat. Ann. § 513.44(b).

badges of fraud resulting from Addison's day-of-filing mortgage payment: (1) the transfer was to an insider; (2) Addison retained control of the property after the transfer; (3) the transfer was made after Addison had been sued on his personal guarantee; and (4) Addison was insolvent at the time he transferred the funds to his homestead. Additionally, the bankruptcy court noted that Addison already had significant equity in his home before he made the transfer and that the payment only increased Addison's equity in the home, but did not reduce his monthly mortgage payment. While the bankruptcy court noted that there were badges of fraud favoring both sides, it found that the homestead transfer was made with the intent to hinder, delay, or defraud Addison's creditors, as his intent was "to keep value away from creditors."

The bankruptcy court's underlying factual findings are themselves not clearly erroneous; however, they do not identify any "extrinsic evidence of fraud." In the absence of extrinsic evidence of fraud, we find clear error in the bankruptcy court's ultimate determination of intent to defraud. As discussed above, "[i]t is well established that . . . a debtor's conversion of non-exempt property to exempt property on the eve of bankruptcy for the express purpose of placing that property beyond the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise would be entitled." *Hanson*, 848 F.2d at 868. Rather, for fraudulent intent to be found "there must appear in evidence some facts or circumstances which are extrinsic to the mere facts of conversion of non-exempt assets into exempt and which are indicative of such fraudulent purpose." *Sholdan II*, 217 F.3d at 1010 (quotations and citations omitted).

Here, only the fact that Addison had been sued or threatened with suit prior to making the mortgage payment was extrinsic to the fact of conversion—all of the other facts cited relate to a debtor's simple conversion of nonexempt property to exempt

property on the eve of bankruptcy, which we have long held to be permissible.[12] If these facts alone constitute extrinsic evidence of intent to defraud *Hanson* and *Johnson* would have reached that same result. *See Hanson,* 848 F.2d at 867–68 (rejecting argument that extrinsic evidence established debtor's intent to defraud where debtors, after defaulting on bank loans and talking to bankruptcy counsel, converted approximately $20,000 into life insurance policies a couple of weeks prior to filing and prepaid an additional $11,033 on their homestead mortgage two days before filing); *Johnson*, 880 F.2d at 79 ("agree[ing] that there is no fraud as to [debtor's] homestead exemption," where debtor, in contemplation of filing bankruptcy, talked to bankruptcy attorney and paid off $175,000 in debts against his home after creditors obtained judgments against him). Moreover, the bankruptcy court's finding that Addison converted his nonexempt property to exempt property with the intent "to keep value away from creditors" does not provide extrinsic evidence of fraud as such an intent is not automatically impermissible. *Hanson*, 848 F.2d at 868; *Tveten*, 848 F.2d at 873–74.

This case resembles *Hanson*. The Hansons, married farmers, defaulted on several bank loans when financial difficulties arose. 848 F.2d at 867. Before they filed for bankruptcy, the Hansons consulted an attorney, and on the advice of counsel, they sold several nonexempt items to family members for fair-market value. *Id.* A couple of weeks before filing for bankruptcy, the Hansons took the proceeds from the sales of the nonexempt assets and bought life insurance policies on each of them with a cash-surrender value of approximately $10,000 each. Then two days prior to filing for bankruptcy they prepaid $11,033 on their homestead mortgage. *Id.* Upon filing for

---

[12]A debtor's conversion of his own nonexempt property into exempt property also owned by him could always be viewed as a transfer to an insider. Likewise, after that conversion, the debtor would continue to control the property after the conversion. And, a debtor converting nonexempt property to exempt property "on the eve of bankruptcy" will almost always be insolvent. Thus, these "badges of fraud," without more, cannot support a finding of intent to defraud.

bankruptcy, the Hansons claimed their life insurance policies and their homestead as exempt. *Id.*

A creditor objected to these exemptions, claiming that the debtors had converted nonexempt property to exempt property on the eve of bankruptcy with intent to defraud their creditors. *Id.* The bankruptcy court denied the objection to the exemptions, finding that the Hansons had done what was permissible under the law and that their actions did not constitute extrinsic evidence of fraud. *Id.* at 868. After the district court affirmed, the creditor appealed to this court. *Id.*

The Hanson panel focused on whether extrinsic evidence established that the Hansons converted their property with the intent to defraud their creditors and concluded that the bankruptcy court was not clearly erroneous in finding no fraudulent intent by the Hansons. *Id.* at 869. In reaching this conclusion, we noted that the bankruptcy court had found that the creditor did not establish any indicia of fraud and further noted that "the Hansons did not borrow money to place into exempt properties; they accounted for the cash they received from the sales; they had a preexisting homestead; and they did not obtain goods on credit, sell them, and then place the money into exempt property." *Id.* Concluding that the debtors "sold their [nonexempt] property for its fair market value and then used this money to take advantage of some of the limited exemptions available under South Dakota law on the advice of counsel," we held that the bankruptcy court was not clearly erroneous in finding that the debtors lacked the intent to defraud and permitting the debtors to claim their full exemptions. *Id.*

Similar to the Hansons, Addison became insolvent (albeit due to a personal guarantee being called rather than defaulting on loans) and prior to filing for bankruptcy he sought the advice of counsel. After discussing prebankruptcy planning with his attorney, Addison transferred some of his nonexempt assets in a brokerage account to fund Roth IRAs for himself and his wife in the amount of $4,000 each.

This mirrors the Hansons' conversion of non-exempt assets into life insurance policies, except that Addison converted a lesser amount into the Roth IRAs than the Hansons did for their life insurance policies. Additionally, Addison made an $11,500 principal mortgage payment on the day he filed his bankruptcy petition—nearly identical to the $11,033 mortgage payment the Hansons made two days prior to their bankruptcy filing. As in *Hanson*, there has been no extrinsic evidence produced here that Addison had any indicia of fraud other than the suit or threat of suit resulting from personal liability on a defaulted loan: Addison did not borrow money to place into exempt assets; he had a preexisting homestead; he did not obtain goods on credit, sell them, then place the money into exempt property; and he did not attempt to conceal the transfers in his bankruptcy filings.

"The sort of indicia of fraud necessary to find fraudulent use on an exemption would be, *inter alia*, conduct intentionally designed to materially mislead or deceive creditors about the debtor's position or use of credit to buy exempt property." *Matter of Armstrong*, 931 F.2d 1233, 1237 (8th Cir. 1991) (citations omitted). Additionally, "[c]onverting a very great amount of property could also be an indication of fraud," as could "[t]he existence of conveyances for less than adequate consideration." *Id.* In the present case, the record contains no extrinsic evidence of any of these indicia of fraud. The record only indicates that Addison's intent was to convert some of his nonexempt property to exempt property on the eve of bankruptcy, something that is "well established" in this circuit that he is allowed to do. *Hanson*, 848 F.2d at 868 ("It is well established that . . . a debtor's conversion of non-exempt property to exempt property on the eve of bankruptcy for the express purpose of placing that property beyond the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise would be entitled"). Accordingly, we conclude that it was clear error for the bankruptcy court to find that Addison had the requisite intent to hinder, delay, or defraud a creditor when he converted some nonexempt property into his homestead on the day he filed bankruptcy.

Additionally, circuit precedent upholding findings of fraudulent intent differ factually from this case. For example, in our most recent decision on the issue, *Sholdan II*, which came back before the court after our remand in *Sholdan I*, discussed above, we upheld the bankruptcy court's finding of intent to defraud, stating:

> It is one thing to convert non-exempt assets into exempt property for the express purpose of holding it as a homestead and thereby putting the property beyond the reach of creditors. However, it is quite another thing to acquire title to a house for no other reason than to defraud creditors.

*Sholdan II*, 217 F.3d at 1011.[13]

In the present case, however, Addison did not "acquire title to a house for no other reason than to defraud creditors" as Sholdan had. Addison had owned his house for years prior to his bankruptcy filing and merely converted nonexempt assets into the homestead to protect it from the reach of creditors—the exact action that we implied was permissible in upholding the finding of intent to defraud in *Sholdan II*. *Id.*

Moreover, in *Tveten*, we upheld the finding of intent to defraud based on the evidence surrounding the debtor's conversion of nonexempt assets to exempt assets prior to bankruptcy.[14] 848 F.2d at 876. In that case, the debtor was a physician who

---

[13]As discussed above, the debtor in *Sholdan* was a 90-year old who, after being sued, liquidated nearly all of his nonexempt assets and used the proceeds to purchase a home in cash, just prior to filing for bankruptcy protection, even though the debtor had been living in an assisted living facility for a year prior to the home purchase, and in an apartment for the 13 years prior to that.

[14]Although *Tveten* dealt with the denial of discharge under § 727(a)(2) and not the objection to exemptions, because both issues are governed by identical language—intent to hinder, delay, or defraud a creditor—the standard applied to determine whether a discharge should be denied on the basis of intent to hinder, delay,

-17-

owed creditors nearly $19 million, mostly on personal guarantees. *Id.* at 872. When a number of the debtor's investments declined in value, he met with a bankruptcy attorney, and then, on counsel's advice, converted almost all of his nonexempt property (approximately $700,000) into exempt life insurance policies and annuities, through a series of 17 transactions on the eve of bankruptcy. *Id.* After Tveten filed for bankruptcy, the trustee objected to his claimed exemptions in the property, and a creditor moved to deny his discharge. *Id.* at 873. The bankruptcy court denied Tveten's discharge, prior to ruling on the objection to exemptions, finding that he had converted his nonexempt property to exempt property with the intent to defraud a creditor. *Id.* We affirmed the denial of discharge, ruling that the finding of intent to defraud was not clearly erroneous, noting that Tveten's attempt to shield $700,000 from creditors while attempting to discharge over $18 million in debt went well beyond the purposes for which exemptions are permitted. *Id.* at 876. Although not citing to specific extrinsic evidence of intent to defraud, we noted that "the entire pattern of conduct" surrounding the conversions demonstrated fraudulent intent. *Id.*

*Tveten* differs markedly from the present case. Unlike *Tveten*, Addison did not attempt to convert "almost his entire net worth" into exempt assets prior to bankruptcy. Rather, Addison left substantial nonexempt assets for his creditors to recover. In fact, the Trustee-initiated auction of some of Addison's nonexempt assets brought in proceeds in excess of $10,000. Moreover, the total amount of converted assets at issue in this case is less than $20,000, only a fraction of the amount present in *Tveten*.

---

or defraud is the same as the determination in this case as to whether Addison's exemption should be allowed. *See Tveten*, 848 F.2d at 874 ("Although the determination as to whether a discharge should be granted or denied is governed by federal law, the standard applied consistently by the courts is the same as that used to determine whether an exemption is permissible, i.e. absent extrinsic evidence of fraud, mere conversion of non-exempt property to exempt property is not fraudulent as to creditors even if the motivation behind the conversion is to place those assets beyond the reach of creditors").

In sum, we conclude that the bankruptcy court clearly erred in finding that Addison converted nonexempt property into his homestead with the intent to hinder, delay, or defraud a creditor. On the record before us, there is no extrinsic evidence of intent to hinder, delay, or defraud a creditor sufficient to uphold that finding. The evidence only suggests that Addison was converting nonexempt assets to exempt assets to place some (but not all or substantially all) of those assets beyond the reach of creditors—something our precedent permits.

## 2. *Roth IRA Exemption*

The bankruptcy court also denied Addison's claimed exemption in his $4,000 Roth IRA, finding that Addison had transferred nonexempt funds into the Roth IRA with the intent to hinder, delay, or defraud a creditor. Again, the determination of intent is a finding of fact reviewed for clear error. *Sholdan II*, 217 F.3d at 1010.

The bankruptcy court found Addison acted with intent to hinder, delay, or defraud regarding the transfer of funds to the Roth IRA "for the same reasons" as it found intent to hinder, delay, or defraud regarding the payment on the home mortgage. As discussed above, that finding of intent was clearly erroneous, and thus the disallowance of the Roth IRA exemption must be reversed as well. Likewise, the bankruptcy court's additional finding that Addison's real reason[15] for converting nonexempt assets into the Roth IRA was "just [to] keep the money out of the hands of creditors," will not suffice to establish intent to hinder, delay, or defraud as a debtor may intentionally convert nonexempt assets to exempt assets for the express purpose of keeping the money out of the hands of creditors, unless there is extrinsic evidence of fraud. *See Hanson*, 848 F.2d at 868 ("It is well established that . . . a debtor's conversion of non-exempt property to exempt property on the eve of bankruptcy for the express purpose of placing that property beyond the reach of creditors, without

_____

[15]Addison's stated reason for converting the nonexempt funds to the Roth IRA was to provide for his retirement.

-19-

more, will not deprive the debtor of the exemption to which he otherwise would be entitled").

## B. *Denial of Discharge*

Following the bankruptcy court's ruling on the Trustee's objections to exemptions, wherein it found that Addison had converted nonexempt assets into his homestead and Roth IRA with the intent to hinder, delay, or defraud a creditor, the Trustee filed an adversary proceeding objecting to Addison's discharge under § 727(a)(2) of the Code. Section 727(a)(2) of the Bankruptcy Code states, in relevant part, that:

> (a) The court shall grant the debtor a discharge, unless–
>
> . . .
>
> (2) the debtor, *with intent to hinder, delay, or defraud a creditor* . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
>
> (A) property of the debtor, within one year before the date of the filing of the petition
>
> . . .

11 U.S.C. § 727(a)(2) (emphasis added).

The Trustee's objection to discharge cited, among other things, Addison's conversion of nonexempt assets into his homestead and Roth IRA. As there was no dispute that Addison had made the transfers to his homestead and the Roth IRA within one year before his bankruptcy filing and that the transfers were made from property of the debtor, the only issue before the bankruptcy court was whether these transfers had been made "with intent to hinder, delay, or defraud a creditor." Because the bankruptcy court had already determined, in ruling on the Trustee's objections to exemptions, that Addison had made the transfers to his homestead and Roth IRA with

the intent to hinder, delay, or defraud a creditor, the bankruptcy court granted the Trustee's motion for summary judgment on collateral estoppel grounds and denied Addison's discharge.

In this case, the same standard applies to determine whether a discharge should be denied or whether a transfer of nonexempt property to exempt property should be voided; both require proof that the debtor acted with the intent to hinder, delay, or defraud a creditor. *Tveten*, 848 F.2d at 874.[16] Because we reversed the bankruptcy court's determination of intent to hinder, delay, or defraud a creditor on the exemption issues, the denial of discharge based on the collateral estoppel effect of that finding must also be reversed.

## C. *Section 529 Accounts*

Lastly, the bankruptcy court ruled that the two Section 529 tuition savings accounts[17] that Addison opened in 2004 for the benefit of his children were property of Addison's bankruptcy estate and not subject to any exemption. Whether the Section 529 accounts are property of the bankruptcy estate is a legal conclusion reviewed de novo. *See Drewes v. Vote (In re Vote)*, 276 F.3d 1024, 1026 (8th Cir. 2002) ("Whether property is included in the bankruptcy estate is a question of law.") (citation omitted).

---

[16]"Although the determination as to whether a discharge should be granted or denied is governed by federal law, the standard applied consistently by the courts is the same as that used to determine whether an exemption is permissible, i.e. absent extrinsic evidence of fraud, mere conversion of non-exempt property to exempt property is not fraudulent as to creditors even if the motivation behind the conversion is to place those assets beyond the reach of creditors." *Tveten*, 848 F.2d at 874.

[17]Section 529 of the Internal Revenue Code exempts certain qualified tuition programs from taxation, and permits each State (or an agency or instrumentality thereof) to establish and maintain such programs. 26 U.S.C. § 529. Pursuant to § 529, Minnesota established its college savings plan, and set forth the rules of its plan by statute. *See* Minn. Stat. Ann. § 136G.01 *et seq.*

Addison listed the Section 529 accounts in his amended bankruptcy schedules with a notation that he believed that the accounts were owned by his children, and thus not property of his bankruptcy estate. Nevertheless, in case the accounts were determined to be property of the estate, Addison claimed them as exempt under Minn. Stat. Ann. § 136G.09(12). We conclude that the Section 529 accounts are nonexempt property of Addison's estate.

Section 541(a)(1) of the Code, which was unchanged by BAPCPA, states that "[e]xcept as provided in subsections (b) and (c)(2) of this section" a debtor's bankruptcy estate is comprised of "all legal or equitable interest of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Addison asserts that because he established the accounts for the benefit of his children, he had no legal or equitable interest in the accounts. Addison relies on 26 U.S.C. § 529(c) to support his position. That section, which regards tax treatment of designated beneficiaries and contributors of Section 529 accounts, provides that "[a]ny contribution to a qualified tuition program on behalf of any designated beneficiary . . . shall be treated as a completed gift to such beneficiary which is not a future interest in property." 26 U.S.C. § 529(c). Because any contribution to a Section 529 account on behalf of a beneficiary is treated as a completed gift to the beneficiary, Addison argues that the accounts are property of the beneficiaries and not of the contributor or owner of the account. We find this argument unavailing for several reasons. First, § 529(c) deals with the "tax treatment" of contributions to Section 529 accounts, not ownership of the accounts. Second, the accounts Addison established for his children list Addison as the "owner" of the accounts and the Minnesota statutes governing the accounts provide that the owner of the account—not the beneficiary—is the only person entitled to select or change the beneficiary of the account or request distributions from the account. Minn. Stat. Ann. § 136G.09(2). Third, contributions to the accounts "made by persons other than the account owner become property of the account owner," not the beneficiary. *Id.* at § 136G.09(1). Additionally, as the account owner Addison "may request a nonqualified distribution from an account at any time . . .

-22-

subject to a federal additional tax" on the earnings portion of the nonqualified distribution. Minn. Stat. Ann. § 136G.13(3). For all of these reasons, Addison retained a legal and equitable interest in the Section 529 accounts. Therefore, the accounts are property of his bankruptcy estate unless they are excluded from the estate under either 11 U.S.C. § 541(b) or (c)(2). 11 U.S.C. § 541(a)(1).

Section 541(b)(6), added by BAPCPA, expressly excludes, with certain exceptions, Section 529 accounts from property of the estate. Section 541(b)(6), however, did not take effect until October 17, 2005.[18] Because Addison filed his bankruptcy petition on October 14, 2005—three days before § 541(b)(6) became effective—§ 541(b)(6) does not apply to his case.[19] As no applicable provision in § 541(b) or (c)(2) excludes Section 529 accounts from property of the estate, the accounts are property of Addison's bankruptcy estate. *See In re Quackenbush*, 339 B.R. 845, 848 (Bankr. S.D.N.Y. 2006) ("[I]t does not appear that the Bankruptcy Code, as it existed prior to October 17, 2005[,] provided any rationale for excluding [Section 529 accounts] from property of the estate"); *In re Sanchez*, No. 05-48721, 2006 WL 395225, at *1 n.1 (Bankr. D. Mass. Feb. 14, 2006) ("There is no basis for determining that funds deposited into a Section 529 Plan are excluded from property of the estate prior to the recent amendments to the Bankruptcy Code").

Property of the estate, however, may still be exempted from the reach of creditors. 11 U.S.C. § 522(b). As noted above, Addison elected to use the Minnesota state exemption scheme. Minnesota law provides no exemption for these accounts, yet

---

[18]*See* Pub. L. 109-8 § 1501(a) (2005) ("EFFECTIVE DATE–Except as otherwise provided in this Act, this Act and the amendments made by this Act shall take effect 180 days after the date of enactment of this Act").

[19]*See* Pub. L. 109-8 § 1501(b)(1) (2005) ("Except as otherwise provided . . . the amendments made by this Act shall not apply with respect to cases commenced under title 11, United States Code, before the effective date of this Act").

Addison claimed the Section 529 accounts as exempt under Minn. Stat. Ann. § 136G.09(12). Section 136G.09(12) provides:

> All assets of the plan, including contributions to accounts and matching grant accounts and earnings, are held in trust for the exclusive benefit of account owners and beneficiaries. Assets must be held in a separate account in the state treasury to be known as the Minnesota college savings plan account or in accounts with the third-party provider selected pursuant to section 136G.05, subdivision 8. Plan assets are not subject to claims by creditors of the state, are not part of the general fund, and are not subject to appropriation by the state. Payments from the Minnesota college savings plan account shall be made under sections 136G.01 to 136G.13.

Minn. Stat. Ann. § 136G.09(12).

This statute only protects Section 529 account assets from "claims by creditors of the state." *Id.* It does not exempt the accounts from all creditors. Therefore, we conclude that the Section 529 accounts are nonexempt property of Addison's bankruptcy estate.

### III. *Conclusion*

Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

_____