609 F.3d 909 (2010)
In re GRAND JURY PROCEEDINGS, G.S. and F.S., Intervenors, Petitioners. *910 
In re Grand Jury Proceedings, J.P., Petitioner.
Nos. 10-1549, 10-1550.
United States Court of Appeals, Eighth Circuit.
Submitted: April 15, 2010.
Filed: July 1, 2010.
*911 Brent D. Rosenberg, Stanley A. Roush, argued, Cedar Rapids, IA, for petitioner.
Charles J. Williams, Ausa, argued, Cedar Rapids, IA, for respondent.
Before WOLLMAN, MURPHY, and BYE, Circuit Judges.
WOLLMAN, Circuit Judge.
Attorney J.P. and his clients, intervenors G.S. and F. S., appeal from the district court's[1] order compelling J.P. to testify and produce documents for the purpose of grand jury proceedings. The appellants argue that the testimony and documents are not discoverable because they are covered by the attorney-client privilege and attorney work product privilege. Because we conclude that the crime-fraud exception applies to the testimony and documents at issue, we affirm.

I.
This case involves a grand jury investigation for bankruptcy fraud. In order to observe the requirements of grand jury secrecy, we provide only a limited recitation of the facts. Clients G.S. and F.S. are Iowa residents who owned several businesses that started experiencing financial difficulty around 2001. Recognizing that they would likely be unable to meet all of their financial obligations, G.S. and F.S. began planning to file for bankruptcy protection. In late 2001 they sought legal advice from attorney J.P., who had substantial experience in the area of bankruptcy law. G.S. and F.S. subsequently changed their residence from Iowa to Florida, a state which allows debtors to exempt more of their assets from the bankruptcy estate.
When G.S. and F.S. first met with J.P., they had a number of non-exempt assets that would have potentially been subject to liquidation by the bankruptcy trustee to pay their creditors, including thousands of dollars worth of household furniture, jewelry, various stock holdings, and a contract from the sale of a business that entitled *912 them to payments of approximately $300,000 over seven years. G.S. and F.S. sought J.P.'s advice in divesting themselves of these assets and converting the proceeds into assets that would be exempt from the bankruptcy estate. In documents that we have reviewed in camera, J.P. warned his clients about avoiding bankruptcy fraud, counseling them concerning the dangers of engaging in insider transactions with close relatives and recovering assets post-bankruptcy. J.P. advised G.S. and F.S., for example, that they should not sell their furniture to G.S.'s father and keep it in their home, as the circumstances would suggest a sham transaction that bore badges of fraud. J.P. also cautioned against involving G.S.'s father in a transaction in which non-exempt stock would be pledged as collateral for a loan, telling G.S. that "I strongly advised your father to have nothing to do with this transaction."
Notwithstanding this advice, G.S. and F.S. divested themselves of nearly all of their non-exempt assets by selling or loaning them to close family members. The furniture, jewelry, business contract, and some of the stock holdings were sold to G.S.'s parents. The remaining stock was pledged to another relative, H.B., in exchange for a $52,000 loan. Because H.B. did not have money to make the loan, however, G.S.'s father gave her $52,000 to give to G.S., and attorney J.P. assisted with the transaction. G.S. and F.S. deposited the proceeds from these various transactions into life insurance policies that were exempt from the bankruptcy estate. In March 2003, a little over a year after the transactions had been completed, G.S. and F.S. began bankruptcy proceedings in Florida.
After the bankruptcy was complete, G.S. and F.S. returned to Iowa and recovered their original assets, repurchasing them from their relatives for the prices at which the assets had been sold. The Federal Bureau of Investigation subsequently began investigating G.S. and F.S. for bankruptcy fraud. In connection with the investigation, the government sought to compel the production of documents and testimony relating to J.P.'s representation of G.S. and F.S. prior to their bankruptcy proceedings. Attorney J.P. invoked the attorney-client and work product privileges and refused to testify or surrender documents to the government. G.S. and F.S. moved to intervene. After an in camera review of the relevant testimony and documents, the district court concluded that the subpoenaed evidence fell within the crime-fraud exception to the asserted privileges and ordered J.P. to appear before the grand jury.

II.
Ordinarily, attorney-client communications and attorney work product are not discoverable, even in a grand jury investigation. In re Green Grand Jury Proceedings, 492 F.3d 976, 979 (8th Cir. 2007). The privileged nature of this evidence, however, is not absolute, for "[u]nder the crime-fraud exception, attorney-client privilege `does not extend to communications made for the purpose of getting advice for the commission of a fraud or a crime.'" Id. (quoting United States v. Zolin, 491 U.S. 554, 563, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989)). Similarly, "a client who has used his attorney's assistance to perpetrate a crime or fraud cannot assert the work product privilege as to any documents generated in furtherance of his misconduct." Id. at 980.
The ability of an attorney to resist discovery of his or her own work product involves a somewhat different analysis, because it is "based on the attorney's interest in protecting his opinions and thought processes from disclosure." Id. In *913 analyzing the extent of an attorney's own work product privilege, we distinguish between two types of work product. Non-opinion work product is "generally discoverable `upon a showing of substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship.'" Id. (quoting In re Murphy, 560 F.2d 326, 336 (8th Cir.1977)). Opinion work product which encompasses a lawyer's opinions, conclusions, mental impressions, and legal theoriesis afforded substantially more protection. "[A]n attorney who is not complicit in his client's wrongdoing may assert the work product privilege with respect to his opinion work product." Id. at 981. Thus, even when an attorney's clients have used the attorney's services to commit a crime or fraud, the government cannot compel production of an attorney's opinion work product if the attorney was unaware of his client's wrongful activities. Id.
With respect to the standard of proof required to establish a crime or fraud, we have held that the district court's finding of probable cause satisfies the evidentiary showing necessary to compel production of privileged documents and testimony.[2]See id. at 983. When, as here, the district court has found probable cause for the application of the crime-fraud exception, we review its decision for abuse of discretion, according its determination considerable deference. Id. at 985.

A. Attorney-Client Privilege
The appellants argue that the district court abused its discretion in finding that there was probable cause to show that G.S. and F.S. sought their attorney's legal advice in furtherance of a crime or fraud. The government responds that there is ample evidence that the clients' pre-bankruptcy transactions, accomplished with their attorney's assistance, violated federal statutes prohibiting bankruptcy fraud.[3]
The appellants' main contention is that they engaged in legitimate pre-bankruptcy exemption planning and did not violate any laws when they transferred their non-exempt assets to close relatives before filing their bankruptcy papers. In support of this argument, they cite In re Addison, 540 F.3d 805, 813 (8th Cir.2008), in which we reiterated the well-settled proposition that the mere conversion of nonexempt assets into exempt assets pre-bankruptcy is not in itself fraudulent. The touchstone for bankruptcy fraud is not the conversion of an asset from one form to another, which in many cases may simply allow a debtor to take advantage of legislatively sanctioned exemption provisions. *914 Rather, the critical issue is whether the debtor had fraudulent intent. See In re Sholdan, 217 F.3d 1006, 1010 (8th Cir. 2000). From this principle G.S. and F.S. extrapolate that the district court could not conclude that their actions were fraudulent unless it relied upon an unwarranted assumption about their purposes when they transferred their assets. As we explained in Addison, however, there are a variety of factors that courts look at in determining whether a debtor's actions crossed the line from legitimate bankruptcy planning to fraudincluding whether there was any conduct designed to mislead, whether the debtor made an effort to conceal the pre-bankruptcy transfers, whether the transaction involved an insider, and the amount of property converted from non-exempt to exempt. 540 F.3d at 814, 816; see also Sholdan, 217 F.3d at 1009 ("Given the fact that direct evidence of fraud is rare, a court in most instances can only infer fraud by considering circumstantial evidence."). In certain cases a debtor's entire pattern of conduct may also suggest fraudulent intent, as when a debtor attempts to exempt virtually all of his assets from creditors while seeking the aid of the bankruptcy court in discharging a large amount of debt. Addison, 540 F.3d at 817 (discussing Norwest Bank Neb., N.A. v. Tveten, 848 F.2d 871, 876 (8th Cir.1988)).
We conclude that the district court did not abuse its discretion in making its probable cause determination. The facts indicative of fraudulent intent in this case include the debtors' transfer of virtually all of their non-exempt propertywhich consisted of a variety of different assets worth hundreds of thousands of dollarsto close relatives. Even if certain individual transactions might have been permissible standing alone, as the appellants argue, when taken together these activities evince a pattern of conduct that may have gone beyond legitimate pre-bankruptcy exemption planning. Further, some of the transfers appeared to be specifically designed to conceal the true nature of the underlying transactions, as when G.S.'s father gave another relative, H.B., $52,000 so that she could loan the money to G.S., with his nonexempt stock holdings serving as collateral. The circumstances suggest that G.S. and F.S. may have avoided a more direct transaction with G.S.'s father because they feared that an intra-familial loan would arouse the suspicion of the bankruptcy trustee.
Moreover, the evidence indicates that once the bankruptcy was complete, G.S. and F.S. recovered their original assets from their family members for the same prices at which the assets had initially been sold. G.S. and F.S. also temporarily relocated to Florida to file their bankruptcy papers and returned to Iowa after the proceedings were final. Taken together, these facts give rise to the inference that G.S. and F.S. carried out a carefully planned scheme to divest themselves of all of their property through sham transactions, discharge their debts in bankruptcy, and immediately reacquire their original assets. If G.S. and F.S. had a secret agreement with their relatives to retrieve their property post-bankruptcy, as the circumstances tend to suggest, it is also arguable that their conduct involved illegal concealment of assets. See United States v. Turner, 725 F.2d 1154, 1157 (8th Cir.1984) (explaining that the definition of concealment under 18 U.S.C. § 152 is broad and may include withholding knowledge or preventing disclosure or recognition); see also United States v. West, 22 F.3d 586, 589-90 (5th Cir.1994) (holding that violations of 18 U.S.C. § 152 are not limited to fraudulent transfers within one year of filing bankruptcy, as appellant had argued). In short, there is a reasonable likelihood that the activity at issue here crossed the line from legitimate pre-bankruptcy exemption *915 planning to a crime or fraud, with G.S. and F.S. using their attorney's advice to structure and carry out their transactions. Accordingly, the district court properly found that G.S. and F.S. could not assert the attorney-client privilege or the work product privilege with regard to J.P.'s representation of them in matters related to their bankruptcy.

B. Work Product Privilege
Attorney J.P. separately resists the government's discovery of his work product related to representation of G.S. and F.S. In light of our holding regarding the possible misconduct of J.P.'s clients in close connection with J.P.'s legal advice, we conclude that the government has shown a substantial need for J.P.'s non-opinion work product. That evidence may contain information critical to the government's case should this matter proceed to a criminal trial, for the government would likely need to prove both the exact nature of the transactions and the clients' intent at the time that they were undertaken. Because the appellants do not contend that the government can obtain the materials through any other means, we also conclude that the district court did not err in compelling production of non-opinion work product. See Green Grand Jury Proceedings, 492 F.3d at 980 (explaining the standard for obtaining non-opinion work product).
The district court determined that J.P.'s opinion work product was discoverable because there was probable cause to believe J.P. was complicit in his clients' unlawful activity. We conclude that the district court did not abuse its discretion in making this finding. J.P.'s prior experience in the area of bankruptcy law should have made obvious to him the distinction between legitimate exemption planning and bankruptcy fraud. As noted previously, in documents that we have reviewed in camera, J.P. expressed concern to his clients about the legality of transferring assets to close relatives and retrieving the transferred assets post-bankruptcy.[4] Although J.P. warned his clients that G.S.'s father should not be involved in the stock transfer in which some of G.S.'s non-exempt stock was pledged as collateral for a loan, J.P. later apparently ignored his own advice and helped facilitate the questionable transaction.
There is also a reasonable likelihood that J.P. either knew or was willfully blind to the fact that his clients were entering sham transactions with relatives so that they could later retrieve their original assets after discharging their debts. The appellants contend that J.P. had no knowledge of his clients' plans once the bankruptcy proceedings were complete. The documents that we have reviewed, however, suggest that J.P. was aware that G.S. and F.S. were contemplating strategies for reacquiring at least some of their assets at a later time. In spite of his apparent knowledge that this scheme could be illegal, J.P. continued to assist G.S. and F.S. in parking their assets with close family. Giving the district court's determination the deference to which it is entitled, we hold that the court did not abuse its discretion in finding that there was probable cause to believe that J.P. was complicit in his clients' crime or fraud. Accordingly, the district court properly held that J.P. could not assert the work product privilege with regard to his representation of G.S. and F.S. in matters related to their bankruptcy.

*916 III.
The judgment is affirmed. Mandate to issue forthwith.
BYE, Circuit Judge, concurring in part and dissenting in part.
I join in the Court's decision in Section II(A) affirming the district court's application of the crime-fraud exception to the attorney-client privilege. However, I would conclude the district court erred in its application of the crime-fraud exception to J.P.'s assertion of the work product privilege because of the great protection afforded opinion work product. I therefore respectfully dissent from Section II(B) of the Court's opinion, and from the Court's judgment.
Historically, a lawyer's mental impressions, conclusions, opinions, and legal theories have been afforded substantial protection in order to secure the lawyer's effective advocacy and representation of his or her clients' interests. In re Special September 1978 Grand Jury (II), 640 F.2d 49, 63 (7th Cir.1980). "It has been a very rare case, indeed, in which inquiry has been permitted into the internal operation of the lawyer's office." Id. (citing 4 J. Moore, Federal Practice P. 26.03(8) at 394 (2d ed.1979)). The Supreme Court has cautioned against the unjustified invasion of a lawyer's work product and the severe consequences that follow from such an action:
Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways-aptly though roughly termed by the Circuit Court of Appeals in this case as the "Work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.
Hickman v. Taylor, 329 U.S. 495, 510-511, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (internal citation omitted). Our circuit has interpreted Hickman and its progeny to afford opinion work product "nearly absolute immunity." In re Murphy, 560 F.2d 326, 336 (8th Cir.1977).
In In re Green Grand Jury Proceedings, 492 F.3d 976, 980 (8th Cir.2007), this court reaffirmed "[o]pinion work product. . . enjoys nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances" upon a compelling showing. Even if a client uses a lawyer's services to commit a fraud, the lawyer may continue to assert the work product privilege as long as he or she is unaware of the client's conduct. Id. at 981; In re Grand Jury Proceedings, 867 F.2d 539, 541 (9th Cir.1989); 1978 Grand *917 Jury, 640 F.2d at 63 ("We are persuaded, however, that the attorney's mental impressions, conclusions, opinions, and legal theories must still be protected in order to avoid an invasion of the attorney's necessary privacy in his work, an invasion not justified by the misfortune of representing a fraudulent client.") (emphasis added).
I do not believe the instant matter presents the "rare and extraordinary" case where J.P.'s opinion work product may be discovered because there has not been a compelling showing justifying such a demanding intrusion. Even if the government established a prima facie case that G.S. and F.S. were engaged in criminal activity, and they used J.P.'s advice in furtherance of that activity, the government failed to establish J.P. himself knowingly participated in any criminal activity.
Notably, the district court relies on J.P.'s knowledge of the $52,000 stock transfer from G.S. to H.B. in support of its determination to compel production of J.P.'s opinion work product. However, contrary to the government's assertion, it appears this transaction was merely a loan whereby the stock was pledged as collateral in order for G.S. to maintain his lifetime healthcare coverage associated with the stock. The stock remained an asset of G.S., and therefore an asset of the bankruptcy estate, which was explicitly disclosed on both the personal property and secured creditor schedules attached to G. S.'s bankruptcy filing. Moreover, a review in camera, at best, demonstrates J.P. helped G.S. effectuate the loan; it does not establish J.P. assisted G.S. or F.S. in wrongly reacquiring the stock, or any other assets, post bankruptcy. See Murphy, 560 F.2d at 336 n. 19 (noting opinion work product may not be immune if it contains inculpatory evidence of the attorney's criminal activity). J.P. testified he was not aware G.S. reacquired the stock until the day of his grand jury testimony. Indeed, there is no dispute J.P.'s representation ceased prior to G.S. and F.S. filing for bankruptcy, a task which was accomplished for them utilizing another lawyer.
The above circumstances demonstrate J.P.'s conduct appears more aligned with legitimate exemption planning than fraudulent activity. "It is well settled that the mere conversion of non-exempt assets to exempt assets is not in itself fraudulent." In re Addison, 540 F.3d 805, 813 (8th Cir.2008) (citation omitted). Given the near absolute immunity afforded opinion work product, I believe the government failed to present a compelling showing that J.P. was knowingly complicit in any criminal activity. In cases such as this, I believe the freedom from intrusion lawyers enjoy and require for their opinion work product must be protected in order to best serve their clients' interests and maintain the integrity of our legal system. Accordingly, I would conclude the district court erred by applying the crime-fraud exception.
I therefore respectfully dissent.
NOTES
[1] The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa, adopting as modified the report and recommendation of the Honorable Jon Stuart Scoles, United States Magistrate Judge for the Northern District of Iowa.
[2] We have distinguished between the lower standard of proof necessary to justify a district court's initial in camera review and the higher burden necessary to compel production of the evidence. See In re BankAmerica Corp. Sec. Litig., 270 F.3d 639, 641-42 (8th Cir.2001) (explaining the standard for obtaining in camera review). Because we conclude that the evidence meets the higher threshold necessary to compel production, however, we focus only on that standard.
[3] The government lists as examples 18 U.S.C. §§ 152, 157, and 371, among others. Those statutes make it unlawful to engage in bankruptcy fraud or conspiracy to commit bankruptcy fraud. See, e.g., United States v. Wagner, 382 F.3d 598, 608 (6th Cir.2004) (noting that 18 U.S.C. § 152 is a broad statute intended to cover a "wide array of behavior designed to stymie the bankruptcy system, and consequently it targets many different kinds of conduct"); see also United States v. DeSantis, 237 F.3d 607, 613 (6th Cir.2001) (setting forth the elements for a violation of 18 U.S.C. § 157). Although the appellants make several technical arguments about whether various statutes apply based upon statutory construction or the applicable statute of limitations, we agree with the district court that because no criminal conduct has yet been charged, those issues are not properly before us at this stage in the proceedings.
[4] J.P.'s experience arguably should have also apprised him of the fact that a bankruptcy court could find fraud in his clients' attempt to shield virtually all of their assets from creditors while seeking the bankruptcy court's help in discharging a substantial amount of debt.