# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-10780

United States Court of Appeals
Fifth Circuit

**FILED**

June 10, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

LARRY LAKE

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:12-CR-213-1

Before REAVLEY, JONES, and GRAVES, Circuit Judges.

EDITH H. JONES, Circuit Judge:*

Appellant Larry Lake was convicted of concealing assets in contemplation of bankruptcy, 18 U.S.C. §§ 152(7) and 2, and tax evasion, 26 U.S.C. § 2701. He appeals both his conviction and sentence. We AFFIRM the conviction, REVERSE the sentence, and REMAND to the district court for resentencing.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-10780

## BACKGROUND

Lake operated a car title loan business, VIP Finance, with six locations in the Dallas/Fort Worth area. VIP Finance allowed individuals with clear title to borrow money using their automobiles as collateral. As part of the loan agreement, customers were required to maintain a mechanical breakdown insurance policy on the vehicles. If a customer did not have insurance, he could purchase "auto club" insurance from VIP Finance. "Auto club" also included the cost of GPS monitoring, which allowed VIP Finance to locate a vehicle for repossession if a customer defaulted on his loan. At some point, however, the GPS monitoring company stopped providing services to VIP Finance, but VIP Finance continued to charge for the service without notifying customers of the changed condition. In addition to VIP Finance, Lake also owned Cash Auto Sales, which handled "auto club" memberships for VIP Finance, and a drugstore called Grapevine Drug Mart.

On November 17, 2004, with several money judgments against him, Lake filed a Chapter 13 bankruptcy petition. In the filing, Lake claimed assets between $0 at $50,000 and liabilities between $500,000 and $1,000,000. The day before he filed for bankruptcy, Lake transferred $2,763,000 from an E*TRADE account in his name to an E*TRADE account held jointly with his wife, Kathy. The same day, he also purchased a cashier's check for $348,000 payable to Air I.Q. a shell company formed in his wife's name. Lake did not disclose these transactions during the bankruptcy case, and his failure to do so is the basis of the bankruptcy crime charged in Count 1 of the superseding indictment. Lake was also charged with money laundering (Counts 2-10), conspiracy to structure transactions (Count 11) and tax evasion for tax years 2006-08 (Counts 12-14).

On November 18, 2009, law enforcement officers searched Lake's home. They found $5,965,057 in cash and business records for Grapevine Drug Mart

No. 13-10780

that post-date when Lake lied to his accountant that he had sold that business. On the day of the search, Lake told the agents he was still charging "auto club" customers for the GPS service that was no longer provided. Lake said that while no one had threatened litigation over the interruption in the GPS service, he was fearful of a class action lawsuit, and that fear motivated him to file for bankruptcy.

Lake was convicted of hiding assets in bankruptcy and tax evasion for the years 2006, 2007 and 2008, but he was and acquitted on the counts of money laundering and conspiracy to structure transactions. Lake was sentenced in the middle of his guideline range to four consecutive terms of 42 months, for a total of 168 months' imprisonment.[1]

On appeal, Lake contends the evidence was insufficient to convict him of hiding assets in bankruptcy. He also challenges four sentencing enhancements authorized by the court.[2]

## STANDARDS OF REVIEW

Lake moved for judgment of acquittal at the close of the Government's case and at the close of evidence. Because of the timely objections, we review the sufficiency of the evidence de novo. *United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011), *cert denied*, 132 S. Ct. 191 (2011). This Court's review is "highly deferential to the verdict." *United States v. Ollison*, 555 F.3d 152, 160 (5th Cir. 2009). When considering whether there is sufficient evidence, "this Court asks only whether the jury's decision is rational, not whether it was correct." *United States v. Rodriguez*, 553 F.3d 380, 389 (5th Cir. 2008). All

---

[1] The court assessed $550,000 in fines against Lake but did not order restitution because the bankruptcy creditors had been paid and the court looked to the IRS to recover taxes, penalties and interest from Lake.

[2] Because we reverse the sentence on procedural grounds, we need not reach Lake's additional issue of substantive reasonableness.

No. 13-10780

credibility determinations and reasonable inferences are resolved in favor of the verdict. *United States v. Nguyen*, 28 F.3d 477, 480 (5th Cir. 1994)

The district court's interpretation and application of the sentencing guidelines are reviewed de novo and the district court's factual findings at sentencing for clear error. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008).

## DISCUSSION

### I. Sufficiency of the Evidence, Hiding Assets in Contemplation of Bankruptcy

#### 1. Intent to Defraud

Lake argues that there was insufficient evidence that he transferred or concealed assets with the intent to defraud any creditor. *See United States v. Willey*, 57 F.3d 1374, 1380 (5th Cir. 1995). The indictment charged Lake with knowingly and fraudulently concealing $2.73 million transferred from his E*TRADE account to an account jointly held with his wife and $348,000 transferred from his bank account to his wife's shell corporation. Both transfers were completed the day before Lake filed for bankruptcy. Because the bankruptcy plan into which he entered provided full payment to the creditors who perfected their claims, he argues that there is insufficient evidence that he completed the transfers with fraudulent intent.

Lake's argument is undermined by his own admission to investigators that he filed for bankruptcy in hopes of avoiding a class action by "auto club" customers who learned that they were billed for a non-existent GPS tracking service. Despite his statement, Lake contends that no reasonable juror could have concluded that he transferred the funds to defraud customers who had not yet threatened to sue. Furthermore, Lake contends that "auto club" customers were unlikely to sue because the GPS services were provided for

Lake's benefit, as an aid to repossessing cars from borrowers who defaulted on their loans. The jury, however, was entitled to disbelieve Lake's excuses.

The timing and the amount of the transactions – millions of dollars the day before he filed for bankruptcy – are evidence that Lake had the intent to defraud. Lake also signed false declarations concerning his assets at the time of filing bankruptcy and afterward throughout the bankruptcy proceedings. That he deposited some of the assets in a shell corporation controlled by his wife was also probative of an intent to defraud. *See United States v. Daniels*, 247 F.3d 598, 600-01 (5th Cir. 2001). Taken together, his actions and statements provide strong evidence of fraudulent intent to conceal assets "in contemplation" of bankruptcy. We conclude that there was sufficient evidence for jury to find that Lake had the requisite intent.

## 2. Transfer "out of" bankruptcy estate

Lake next argues that transferring funds from his E*TRADE account to an E*TRADE account held jointly by him and his wife cannot form the basis of his conviction because the jointly held account remained part of the bankruptcy estate, albeit a part that he never disclosed to the court. He contends that removing assets *from the bankruptcy estate* is required to sustain a conviction under 18 U.S.C. § 152(7). Though cast as a sufficiency argument, Lake is arguing for the first time on appeal that the Government must prove that Lake transferred assets out of the bankruptcy estate in order to sustain a conviction. Unpreserved legal issues are reviewed for plain error – even when the appellant casts the argument as sufficiency of the evidence. *See United States v. Treft*, 447 F.3d 421, 424-25 (5th Cir. 2006).

In any case, we need not reach this argument. The E*TRADE transfer was only one of two transfers that supported the bankruptcy concealment conviction. Lake's argument does not extend to the second transfer of funds, $348,000 from his bank account to an account controlled by Lake's wife and

belonging to the shell corporation Air I.Q. That transfer alone would be sufficient to support the conviction, thus, even if there were error it would be harmless. *See Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (per curiam) (applying harmless error analysis to a potential error in jury instructions where there are multiple theories of guilt "so long as the error at issue does not categorically vitiat[e] *all* the jury's findings.") (emphasis in original, citation omitted); *United States v. Turner*, 674 F.3d 420, 443 (5th Cir. 2012) (applying *Hedgpeth*).

## II.    Sentencing

Because Lake's bankruptcy offense was unrelated to the tax evasion counts, he received a multiple count adjustment under the United States Sentencing Guidelines ("U.S.S.G.") rather than a grouped offense level. This situation enables him to challenge enhancements that apply, respectively, to the bankruptcy conviction offense level (intended loss), the tax evasion level (unreported income from criminal activity, tax loss to government) and to the adjusted level (supervisory role enhancement). We consider each of these.

### 1.    Intended Loss from Bankruptcy Crime

To calculate the total offense level on the bankruptcy crime, the district court determined that the intended loss was at least equal to the amount of money Lake concealed before filing: $3.1 million.[3] Because the intended loss by this calculation exceeded $2.5 million, Lake's offense level was increased by 18 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(J).

---

[3] The Pre-Sentence Report noted that during the bankruptcy Lake received an additional $1.325 million dollars through Grapevine Drug Mart that was not reported to the trustee or creditors. The district court found that $3.1 million was legitimately included in the loss calculation, and because that amount already exceeded the $2.5 million dollar guideline, the court declined to reach the question of whether the additional money (referred to in the transcript as $1.4 million) should be included in the intended loss calculation.

No. 13-10780

Lake contends that this calculation was erroneous, because he only had approximately $165,000 in unsecured debts when he filed for bankruptcy.[4] He argues he could not have intended to cause a loss in excess of his debts. He also contends that the district court's conclusion that he intended to cause a loss to "auto club" members who may have brought claims against him in the future was too speculative to support the loss calculation adopted by the court.

We have previously held that "the total of the debts listed in a fraudulent bankruptcy is not necessarily an appropriate measure of the loss intended." *United States v. Saacks*, 131 F.3d 540, 542 (5th Cir. 2002). Here, the district court concluded that Lake intended to cause a greater loss because he hoped to appear judgment proof and avoid future claims against him. While that theory is plausible, nothing in the record indicates how much such future claims might have been worth. In the absence of such evidence, the district court used the amount of money Lake concealed as a proxy for intended loss, but there is no logical connection between the amount of money Lake hid and the value of the speculative claims. While the district court is afforded "wide latitude to determine the amount of loss" it still must "make a reasonable estimate based on available information." *United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007). In the absence of any evidence offered by the government on this point, the district court clearly erred when it concluded that Lake intended to cause a loss exceeding $2.5 million. Therefore, we must reverse the sentence and remand for resentencing on this issue. We do not hold that claims for unprovided GPS monitoring are necessarily valueless for sentencing (*but see* the discussion in the next section), only that they were obviously not worth the entire amount of assets Lake concealed. Further loss

---

[4] Other relevant figures from the bankruptcy case are $275,000 in total listed debts or $75,000 in discharged debts.

No. 13-10780

amounts might derive from the expenses Lake imposed on others via an unjustified bankruptcy filing: had he fully disclosed his assets, he could not have qualified for a Chapter 13 case.

### 2.    Unreported Income from Criminal Activity

Regarding Lake's tax evasion conviction, the district court applied a two-level enhancement pursuant to U.S.S.G. § 2T1.1(b)(1), overruling the defendant's objection and finding that "the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity."

Texas Penal Code § 32.32 states that "[a] person commits an offense if he intentionally or knowingly makes a materially false or misleading written statement to obtain property or credit, including a mortgage loan." The Pre-Sentence Report ("PSR") determined that Lake knowingly and intentionally charged customers for a GPS monitoring service not provided to them and thereby violated this Texas statute. The district court adopted the PSR's conclusion, finding that Lake had charged for a service he did not provide and that he failed to disclose approximately $2.7 million in income from VIP Finance the year he filed for bankruptcy – at least $10,000 of which was presumably derived from the payments for the GPS monitoring service.

Section 32.32 appears to be primarily intended to criminalize intentional misrepresentations by prospective borrowers. *See e.g., Jones v. State*, 323 S.W. 3d 885 (Tex. Crim. App. 2010). Whether the text of the statute could include Lake's behavior is dubious; the government did not cite a single example of the law's application to defendants in a similar position to Lake. But we pretermit that question because there is no evidence that the GPS representation was material to the VIP Finance customers' decision to borrow, much less to procure the "auto club" breakdown protection insurance. This is particularly

8

true in light of the uncontroverted assertion that the GPS locator was intended to aid VIP Finance in the repossessing defaulting borrowers' vehicles.

The government contends that a lack of evidence of the factual issue of materiality is not sufficient to support a finding of clear error. We disagree. The district court clearly erred when it applied the enhancement despite the absence of *any* evidence to support a finding of materiality. This enhancement is reversed.

### 3.     Calculation of Tax Loss

The district court calculated a base offense level of 26 on the tax evasion counts based on a finding that the loss exceeded $7 million. U.S.S.G. § 2T4.1(k). Lake argues that the district court overestimated the tax loss, and that the offense level should have been 24 based on a tax loss greater than $2.5 million but less than $7 million.

The district court adopted the loss calculation in the PSR, which was based on estimates by the Internal Revenue Service. Those calculations indicated that between 2003 and 2008, Lake failed to disclose approximately $20 million in income from VIP Finance and Grapevine Drug Mart. A loss to the government of $7,000,000, represents 37% of the total undisclosed income. The district court found that the 37% tax rate was reasonably accurate.

Lake argues that because the government used VIP Finance's gross receipts as a basis for income calculation, they included payments that are not income (e.g. return of loan principal). In support of his argument, Lake notes that if the Government's analysis were correct, VIP Finance's net income margin would be far higher than the industry average.

"Although a district court must resolve disputed issues of fact if it intends to use those facts as a basis for sentencing, the court can adopt facts contained in a PSR without inquiry, if those facts ha[ve] an adequate evidentiary basis and the defendant does not present rebuttal evidence."

No. 13-10780

*United States v. Puig-Infante*, 19 F.3d 929, 943 (5th Cir. 1994). Merely asserting that the government's tax calculation is inaccurate, without offering rebuttal evidence, is insufficient. *United States v. Huerta*, 182 F.3d 361, 364 (5th Cir. 1999) ("A defendant's rebuttal evidence must demonstrate that the information contained in the PSR is materially untrue, inaccurate or unreliable and mere objections do not suffice as competent rebuttal evidence.") (citations and quotation marks omitted). The district court relied on a reasonable calculation of tax loss that had a sound evidentiary basis. Lake did not present rebuttal evidence to undermine the calculation. Accordingly, we find no reversible error with respect to the tax loss calculation.

### 4.    Supervisory Role Enhancement

The district court applied a two-level aggravating role enhancement under U.S.S.G. § 3B1.1(c), finding Lake was a leader who supervised his wife as a criminally responsible participant in his crimes. The district court imposed this enhancement over the objection of defense counsel and against the recommendation in the PSR.

Lake argues that the evidence is insufficient to establish that his wife was a criminally responsible participant and that Lake supervised her activities. The Government presented evidence that Lake's wife aided and abetted Lake's concealing assets into the shell corporation she set up. She obtained an assumed name certificate identifying her daughter's address as the business address and set up the corporation's bank account. Lake's wife also deposited cash in bank accounts that Lake concealed from his accountant. In light of this evidence, we affirm the district court's finding of fact that the enhancement applied.

10

No. 13-10780

### 5.    Conclusion

In light of the preceding discussion, we **AFFIRM** Lake's conviction but **REVERSE** the sentence and **REMAND** for resentencing consistent with this opinion.

No. 13-10780

JAMES E. GRAVES, JR., Circuit Judge, specially concurring:

Although I join in the remainder of the majority opinion, I would hold that the district court clearly erred in finding that Lake was an "organizer, leader, manager, or supervisor" of his wife with respect to some criminal activity and consequently applying a two-level enhancement under § 3B1.1(c).

The probation officer declined to include the § 3B1.1(c) enhancement in the presentence report. The government objected, arguing that Lake had acted as an "organizer, leader, manager, or supervisor" of his wife. The government contended that Kathy Lake set up Air I.Q., the shell entity into which Lake deposited $348,000 that he failed to declare in bankruptcy, "upon the instructions of [Lake]." The government also argued that "[t]he evidence makes clear that [Lake] was the 'driving force' behind every financial transaction presented as evidence in the government's case." More specifically, the government argued: "Even though many of the accounts used to conceal bankruptcy proceeds and income not reported on [Lake's] tax returns were not in [his] name, he continued to maintain control over the accounts by directing where funds were deposited and transferred. Further, [Lake] was the person who primarily dealt with the family's tax return preparer, the same preparer from whom the defendant withheld large amounts of reportable income."

The probation officer rejected the government's objection, maintaining that there was insufficient evidence to show that Kathy Lake was a criminally responsible participant. The probation officer also concluded that none of the investigative materials reflected whether Kathy Lake was controlled or directed by Lake, as opposed to a joint and equal participant in his criminal activity. The government filed a second objection to the probation officer's recommendation, discussing at greater length Kathy Lake's involvement in the couple's tax evasion. The government also alleged that Lake typically forged his wife's signature on tax returns and when writing checks on her accounts,

12

suggesting that this showed that Lake "exercised control over K[athy] Lake, through financial transactions." The probation officer again rejected the government's arguments. However, at the sentencing hearing, the district court applied the enhancement "for the reasons stated in the government's objection," without any further explanation.

I agree with the majority that the evidence is easily sufficient to show that Kathy Lake was a criminally responsible participant. The evidence establishes that she was extensively involved in the management of the couple's finances. I can find no evidence, however, reasonably showing that Kathy Lake was managed or controlled by her husband with respect to her criminal activities. Because Kathy Lake died before trial, she was never convicted of any offense, and she obviously did not testify at Lake's trial. Lake also did not testify at his trial. The only evidence at trial directly relating to Lake's control of his wife is the following answer by IRS Special Agent Alan Hampton, who investigated the transactions forming the case against Lake:

> Q: Now, did you also learn in the investigation that – I guess, who is the main financial person in the family, the Lake family of Larry and Kathy Lake?
>
> A: Yeah, it's clearly Larry Lake is in charge of the financial affairs in the family.

Because Hampton failed to elaborate or explain the basis for this opinion, it hardly constitutes probative evidence. No evidence substantiates the government's claim that Kathy Lake set up the Air I.Q. entity at Lake's direction, or that Lake was the "driving force" behind any transactions. In fact, the evidence does not establish that Kathy Lake performed *any* action at Lake's direction.

Given Kathy Lake's extensive involvement and the fact that she appears to have shared in the fruits of the illegal activities, the more plausible inference is that she was involved more as an equal than a subordinate. The fact that

large amounts of Lake's business proceeds were placed into accounts held solely in Kathy Lake's name could even suggest that she was the one in control, at least in the absence of some evidence showing that Lake was able to somehow direct or limit her access to the money.  Ultimately, however, something beyond pure speculation is required.  I can find no basis in the evidence to conclude that it was Lake, rather than his wife or the two of them jointly, who conceived and supervised their criminal schemes.  Without more, I would not affirm the enhancement.