GRUENDER, Circuit Judge,
concurring in part and dissenting in part.
From reading the district court’s 102-page opinion granting Kenneth Vaughn Knight a new trial and this court’s 34-page opinion affirming that decision, one might think that Knight’s case left the jury with an impossibly difficult task. Although the details of the underlying real-estate and monetary transactions are complicated, the primary issue the jury confronted was not nearly as perplexing. For the jury, this case hinged upon whether Knight allowed Brandon Barber to use Knight’s IOLTA fraudulently to conceal funds in contemplation of Barber’s bankruptcy. In my opinion, this issue is close, and a reasonable factfinder could have found either for Knight, or as it ultimately did, against him. Our legal system leaves the resolution of close issues like this one to a jury. “A district court judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result.” United States v. Rivera Rangel, 396 F.3d 476, 486 (1st Cir.2005) (internal quotation marks omitted) (quoting United States v. Rothrock, 806 F.2d 318, 322 (1st Cir.1986)). When “the award of ‘a new trial is predicated on the district court’s evaluation of the weight of the evidence ..., it must be quite clear that the jury has reached a seriously erroneous result.’ ” Id. (alteration omitted) (quoting Rothrock, 806 F.2d at 322). Because I conclude that the district court overstepped its limited authority to afford such relief — an authority that must be “exercised sparingly and with caution,” United States v. Johnson, 474 F.3d 1044, 1051 (8th Cir.2007) — I respectfully dissent from the court’s decision affirming the grant of a new trial.
To prove its fraud-related charges against Knight, the Government had to show (1) that Knight conspired with Barber to commit bankruptcy fraud, 18 U.S.C. §§ 371, 157, and (2) that Knight aided and abetted Barber in committing bankruptcy fraud by “knowingly and fraudulently” transferring or concealing assets “in contemplation of a case under title 11 [bankruptcy],” 18 U.S.C. §§ 152(7), 2. In affirming the district court’s decision to grant Knight a new trial, this court faults the Government for offering “little direct or circumstantial evidence that Knight’s use of his IOLTA was motivated by an intent to defraud Barber’s creditors in bankruptcy....” Ante at 506. In my view, the evidence did not preponderate heavily against the jury’s verdict. I therefore conclude that the district court abused its .discretion when it found that a miscarriage of justice would have occurred if Knight did not receive a new trial.
As an initial matter, both the district court and this court rely on In re Addison, 540 F.3d 805 (8th Cir.2008), to demonstrate the weakness of the Government’s case. The district court noted that Addison, a civil bankruptcy case, stands for the proposition that simply placing money beyond the reach of creditors does not prove fraudulent intent. That may be true; however, the Addison decision limited its application to situations free from any other “indicia of fraud.” Id. at 816. One *514 example of such indicia, as explained in Addison, is “conduct intentionally designed to materially mislead or deceive creditors about the debtor’s position.... ” Id. (quoting Matter of Armstrong, 931 F.2d 1233, 1237 (8th Cir.1991)). In my view, the Government showed such conduct here. Indeed, even this court “agree[s] that the jury could have reasonably concluded that at least some of the money that passed through the IOLTA belonged to Barber and that Knight and Barber used the IOLTA to impede creditors from learning about and pursuing these funds.” Ante at 505 (emphasis added).
Multiple emails presented at trial revealed Knight and Barber’s scheme. In mid-2008, Knight emailed Barber, “I assume you are going to wire your portion and [James Van Doren’s] to me so that it can appear to [F]irst [F]ederal and others that you aren’t paying the money? Correct? I will put on my check [Van Doren’s company] in the Memo line.” In another email, Christy Bennett, a financial assistant in the Barber Group’s accounting department, suggested that Knight write a check from his IOLTA to Barber so that Barber could pay off some debts. This tactic worried Barber, who stated that he “[h]ate[d] to run that much thr[ough] me but were [sic] paying my [credit] card down.... ” Knight, in turn, recommended paying some of the bills directly from his IOLTA and giving Bennett a check for a “lesser amount.” In still another email, Knight contacted Barber and Van Doren about whether to use $100,000 to pay one of Barber’s creditors. Knight explained to Barber that the money “would be coming out [of] the Escrow Account, but we will need to tell Enterprise that [Van Doren’s company] will loan the money.” Knight was unequivocal about why Van Doren’s company needed to be involved: “We don’t want Enterprise to know that there are funds available if they ask where the money is coming from.”[17] All told, roughly $1.2 million passed through Knight’s IOLTA between April 2008 and January 2009.[18]
Knight’s actions with respect to NWARE further reveal the extent to which he plotted with Barber to conceal funds. Before Barber received money from a real-estate deal, Knight emailed him, “We might want to set up a new entity for you to take the payments.... We can set it up so that you don’t own 100% (better creditor protection).” The next day, Knight formed NWARE. Van Doren testified that Barber once described NWARE as an entity that allowed him to conduct business without “creditors ... knowing] that he ha[d] money.” Evidence at trial corroborated Barber’s description. The Government presented án email in which Bennett asked Barber and Knight what address she should list on NWARE’s paperwork. Barber worried that using the Barber Group’s address might “put[ ] up a red flag’.” Knight interjected, “I wonder if [Bennett] could use her home address. I would rather it not have [the] same address as [the Barber Group].” As the court acknowledges, Knight made this suggestion “despite the fact that little-to-no NWARE-related activities occurred at Bennett’s home.” Ante at *515 498. Barber agreed, and Bennett listed her home as NWARE’s registered address.
Because the Government presented enough evidence for a jury to conclude that Knight aided in concealing funds from Barber’s creditors, conviction was proper if sufficient evidence also supported the conclusion that concealment occurred in contemplation of bankruptcy. And in my opinion, the evidence did not preponderate heavily against the jury’s reasonable conclusion that Knight knowingly and intentionally allowed Barber to use Knight’s attorney trust account to defeat the provisions of federal bankruptcy laws by concealing funds from potential bankruptcy creditors. The district court faulted the Government for failing to present direct evidence, noting that “[n]o witness testified to having personal knowledge of a conversation between Barber and Knight where a fraudulent scheme, an intention to defraud, or even a specific intent by Barber to file personal bankruptcy was discussed.” This reasoning is unavailing, as “[pjersons whose intention is to shield their assets from creditor attack ... rarely announce their purpose.” United States v. Goodstein, 883 F.2d 1362, 1370 (7th Cir.1989). And even this court acknowledges that circumstantial evidence “did support an inference that Barber and Knight used the IOLTA to conceal Barber’s (now exhausted) funds from his creditors and the bankruptcy court.” Ante at 507 (emphasis added).
Though the district court and this court downplay the significance of the circumstantial evidence, I would not be so quick to dismiss its persuasiveness. Our court has long recognized that fraud and conspiracy often are proven by circumstantial evidence. See Olson v. United States, 133 F. 849, 854 (8th Cir.1904) (“[I]t is rare[] that a conspiracy or fraud can be established by direct and positive evidence. It is usually shown by a series of acts and circumstances.”). At trial, the Government presented evidence that Knight and Barber considered the possibility of bankruptcy from the outset of their working relationship in early 2008. Before representing Barber, Knight had handled at least ten other bankruptcy matters. When Knight initially emailed Barber to offer his legal assistance, Knight portrayed himself as someone with “quite a bit of experience in the areas of concern.” The next month, Knight proposed using the threat of filing for bankruptcy as a bargaining chip in negotiations with creditors. . Knight also advised Barber to have his personal property appraised, which Knight explained “would typically be done before a bankruptcy filing.”- Knight told Barber, “We want the WHOLE WORLD to know when we have it appraised.” These emails confirm testimony from a former Barber Group employee that bankruptcy was “on the table” in early 2008 when Barber “was beginning to realize that in some form or fashion, because of the pressure he was getting from certain creditors, that he was going to have to file to protect himself.” Indeed, throughout 2008 and early 2009, Barber’s bankruptcy became inevitable. Over this period, Barber’s creditors obtained judgment after judgment — fourteen in total — against him, amounting to over $30 million. Knight, as counsel of record for Barber in most of these cases, was indisputably aware of Barber’s deteriorating financial situation.
This evidence did not leave the jury to speculate about the connection between Knight’s efforts to conceal Barber’s funds and Barber’s subsequent bankruptcy. After all, if not to conceal the transfer of assets from creditors in the eventual bankruptcy proceeding, why would Knight convert his IOLTA into Barber’s personal, off-the-books bank account? Though the court suggests that Knight assisted Barber *516 so he could stave off bankruptcy, the more natural explanation — and the one the jury found compelling — was that Knight used his IOLTA in a coordinated effort to defraud Barber’s potential creditors in the impending bankruptcy proceeding. See United States v. Maloney, 466 F.3d 663, 667 (8th Cir.2006) (“[T]he presence of one possible ‘innocent’ explanation for the government’s evidence does not preclude a reasonable jury from rejecting the exculpatory hypothesis in favor of guilt beyond a reasonable doubt.”). Indeed, several facts undercut the court’s suggestion that avoiding bankruptcy was Barber’s primary concern. For example, Knight used the IOLTA to pay Barber’s expenses for a trip to Las Vegas, including a $19,175 payment to the Venetian. Further weakening the court’s theory, Knight and Barber failed to disclose that large sums of Barber’s money had passed through Knight’s trust account in the year preceding the bankruptcy filing. Cf. United States v. Lake, 571 Fed.Appx. 303, 307 (5th Cir.2014) (unpublished) (noting that the timing and amount of asset transfers, combined with erroneous declarations at the time of filing bankruptcy, evidenced intent to defraud under 18 U.S.C. § 152(7)).
The court’s conclusion that the evidence of innocence weighs heavily against the jury’s finding of guilt overlooks these facts, the context of Knight’s hiring, his advice to Barber, and Barber’s deteriorating financial situation. In addition, this determination overlooks Knight’s inculpatory conduct during the subsequent bankruptcy adversary proceeding, which strongly suggests consciousness of guilt and fraudulent intent. Although Knight initially informed opposing counsel that he wanted to seek a continuance in the bankruptcy adversary proceeding, Knight declined to do so after opposing counsel threatened “to subpoena [Knight’s] firm’s bank records and depose [Knight].... concerning the flow of money to and from [his] firm.” And two days later, while Knight was preparing for the adversary proceeding, he emailed Barber about Van Doren’s deposition testimony. Knight explained that Van Doren had testified that Barber gave Knight money “so judgment creditors could not get it (i.e., intended to hinder delay or defraud creditor).” Knight characterized Van Doren’s testimony as “sing[ing] like a canary.” Barber responded, “I know, he screwed me.”
In light of this evidence, I do not agree with the court’s characterization of the Government’s case as “highly circumstantial, tenuously connected, and ‘largely in-vit[ing] only speculation and conjecture.’ ” Ante at 510-11. The facts of this case are certainly complex, and the strength of the Government’s evidence varied as to the extent and criminal nature of Knight’s complicity in Barber’s various attempts to evade his creditors. To sustain the jury’s verdict, however, the district court did not need to find that the jury unraveled every factual and legal complexity involved in the underlying real-estate transactions involved in this case. Nor did the jury have to conclude that Knight aided Barber in all his unlawful actions. The question this case asked of the jury was far more straightforward: Did the evidence show that Knight allowed Barber to use the IOLTA intentionally to conceal the transfer of assets in contemplation of bankruptcy? The jury concluded that it did. And although the district court faults the jury for its relatively short deliberation, the court just as easily could have concluded that the jury’s ability to render its verdict in just six hours confirms the straightforward nature of the issue it was charged with deciding. See United States v. Brotherton, 427 F.2d 1286, 1289 (8th Cir.1970) (“[T]here is no rule of law which requires a jury to deliberate for any particular period *517 of time.... ”); accord Segars v. Atl. Coast Line R. Co., 286 F.2d 767, 770 (4th Cir. 1961) (noting that the brief duration of deliberation suggested that the jury “so thoroughly understood the points at issue, and were so thoroughly in accord with respect to the verdict, that no more time was needed”).
Our court has not hesitated to reverse the grant of a new trial when a district court “failed to give due weight” to persuasive evidence of guilt and assigned “unduly greater weight to” weak rationales of innocence. United States v. Campos, 306 F.3d 577, 580 (8th Cir.2002). Although the district court conducted a thorough recitation of the evidence in its lengthy opinion, I nevertheless conclude that the court made just such a misstep here. In light of the evidence, I find no miscarriage of justice in the jury’s guilty verdict, and I conclude that the district court abused its discretion in granting Knight a new trial. For this reason, I respectfully dissent.[19]

. Although this payment was never made, this email nonetheless shows Knight's involvement in a scheme to conceal Barber’s funds from creditors.

. The last of Barber's funds were emptied from Knight's IOLTA after a judgment creditor sent Barber interrogatories asking him to list all accounts in which he had made deposits.

. I concur in the court’s decision reversing the judgment of acquittal, but I disagree with the court’s decision to affirm the new-trial grant on the false-statement count. Although the jury instruction did not identify the charged false statement, the indictment, which the jury took to deliberation, did. Moreover, the Government indicated in closing argument that it sought conviction on the false-statement count based upon the schedules submitted to the bankruptcy court. Under these circumstances, the district court should not have afforded Knight plain-error relief for the unobjected-to jury instruction because any error was not "clear or obvious” under settled law. See Puckett v. United States, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009); see also United States v. Adams, 604 F.3d 596, 600 (8th Cir.2010) (finding that no variance occurred because "the government never wavered in its theory of the case”);' accord United States v. Renzi, 769 F.3d 731, 744-45 (9th Cir.2014) (finding no plain error in jury instructions that ”fail[ed] to identify the specific ‘thing of value’ ” charged where "the government’s theory of conviction ... remained consistent”); United States v. Lemusu, 135 Fed.Appx. 52, 53 (9th Cir.2005) (unpublished) (finding no variance or constructive amendment, in part, because "the jury’s copy of the indictment included an accurate list of charged crimes”).